Opinion for the Court filed by Circuit Judge TATEL.
Concurring opinion filed by Circuit Judge KAVANAUGH.
Dissenting opinion filed by Circuit Judge HENDERSON.
*404 TATEL, Circuit Judge:
As part of its ongoing effort to limit the emission of greenhouse gases, the Environmental Protection Agency issued a rule deferring regulation of “biogenic” carbon dioxide — non-fossil-fuel carbon dioxide sources such as ethanol — for three years. Citing scientific uncertainty over how to account for biogenic carbon dioxide’s unique role in the carbon cycle, EPA justified this “Deferral Rule” on the basis of the de minimis, one-step-at-a-time, and administrative necessity doctrines. Several environmental groups now petition for review, arguing that EPA’s invocation of these doctrines was arbitrary and capricious. For the reasons set forth below, we vacate the Deferral Rule.
I.
Under the Clean Air Act, if EPA determines that an “air pollutant ... may reasonably be anticipated to endanger public health or welfare,” 42 U.S.C. § 7521(a)(1), it must regulate that air pollutant under the Prevention of Significant Deterioration of Air Quality (PSD) and Title V permitting programs. See Coalition for Responsible Regulation, Inc. v. EPA, 684 F.3d 102, 132-44 (D.C.Cir.2012) (per curiam). The PSD program, which applies to areas of the country that are classified as in “attainment” or “unclassifiable” for any national ambient air quality standard, 42 U.S.C. §§ 7407(d)(1)(A), 7471, requires certain specified “major emitting facilities],” such as iron and steel mills, to obtain state-issued construction permits if they have the potential to emit over 100 tons per year (tpy) of “any air pollutant,” and all other sources to obtain such permits if they have the potential to emit over 250 tpy, id. §§ 7475, 7479(1). Under the PSD program, sources need permits before starting a construction or modification project. See id. §§ 7411(a)(4), 7475, 7479(2)(C). To obtain a PSD permit, covered sources must install the “best available control technology” (BACT) for all regulated air pollutants — even for air pollutants whose emissions levels are insufficient to trigger the PSD permitting requirement. Id. § 7475(a)(4). In other words, if a source emits two regulated air pollutants — say sulfur dioxide and particulate matter — but triggers the PSD permitting requirement only because it emits 500 tpy of sulfur dioxide, it must install BACT for both. The Title V program requires operational permits for stationary sources that have the potential to emit at least 100 tpy of any regulated air pollutant. See id. §§ 7661-7661Í.
In response to the Supreme Court’s decision in Massachusetts v. EPA, 549 U.S. 497, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007), EPA published an Endangerment Finding for greenhouse gases — a “well-mixed” and “aggregate” group of six gases, including carbon dioxide (C02). Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act (“Endangerment Finding”), 74 Fed.Reg. 66, 496, 66,499 (Dec. 15, 2009). Based on that finding, EPA issued a “cascading series of greenhouse gas-related rules and regulations.” Coalition for Responsible Regulation, 684 F.3d at 114. Partnering with the National Highway Traffic Safety Administration, EPA first promulgated the Tailpipe Rule, which established motor-vehicle emissions standards for greenhouse gases. See Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards; Final Rule, 75 Fed.Reg. 25, 324 (May 7, 2010). Because the “Tailpipe Rule automatically triggered regulation of stationary greenhouse gas emitters under” the PSD and Title V permitting programs, EPA then issued two rules “phasing in stationary *405 source greenhouse gas regulation.” Coalition for Responsible Regulation, 684 F.3d at 115. In the Timing Rule, EPA concluded that major stationary emitters of greenhouse gases became subject to the PSD and Title V permitting requirements on January 2, 2011 — the same date greenhouse gases were subjected to regulation under the Tailpipe Rule. See Reconsideration of Interpretation of Regulations That Determine Pollutants Covered by Clean Air Act Permitting Programs, 75 Fed. Reg. 17,004, 17,007 (Apr. 2, 2010). And in the Tailoring Rule, EPA, recognizing that literal application of the PSD and Title V emissions thresholds would cover millions of sources, “tailored” the statutory thresholds to “relievfe] [the] overwhelming permitting burden[ ] that would ... fall on permitting authorities and sources.” Prevention of Significant Deterioration and Title V Greenhouse Gas Tailoring Rule (“Tailoring Rule”), 75 Fed.Reg. 31, 514, 31,-516 (June 3, 2010). The Tailoring Rule staggers the applicability of the PSD and Title V permitting programs, “starting with the largest [greenhouse gas] emitters.” Id. at 31,514. Under Step One of the Tailoring Rule, which became effective January 2, 2011, the PSD and Title V permitting programs apply only to “ ‘anyway’ PSD [and Title V] sources, that is, sources that are subject to PSD [and Title V] anyway due to their emissions of conventional pollutants,” i.e., non-greenhouse-gas pollutants. Id. at 31,567. Under Step Two of the Tailoring Rule, which became effective six months later, the PSD and Title V permitting programs apply to sources with the potential to emit specified amounts of greenhouse gases. See id. at 31,516. In Coalition for Responsible Regulation, Inc. v. EPA this court upheld the Endangerment Finding and Tailpipe Rule as neither arbitrary nor capricious, concluded that the PSD and Title V permitting programs were unambiguously triggered when EPA issued the Tailpipe Rule, and rejected challenges to the Timing and Tailoring Rules on standing grounds. See Coalition for Responsible Regulation, 684 F.3d at 113-14.
This case involves biogenic carbon dioxide emissions, which EPA defines as carbon dioxide emissions “directly resulting from the combustion or decomposition of biologically-based materials other than fossil fuels and mineral sources of carbon.” Deferral for C02 Emissions from Bioenergy and Other Biogenic Sources Under the Prevention of Significant Deterioration (PSD) and Title V Programs (“Deferral Rule”), 76 Fed.Reg. 43,490, 43,493 (July 20, 2011). Biogenic carbon dioxide emissions are generated from, among other things, “the biological decomposition of waste in landfills, wastewater treatment!,] or manure management processes,” “fermentation during ethanol production,” and the “combustion of biological material, including all types of wood and wood waste, forest residue, and agricultural material.” Id. To use a familiar example, power plants running on coal emit fossil-fuel carbon dioxide whereas power plants burning feedstocks emit biogenic carbon dioxide.
Unlike fossil fuels that emit greenhouse gases only through human-induced combustion, biogenic sources emit carbon dioxide via both natural and anthropogenic processes. A forest fire, for example, will emit biogenic carbon dioxide regardless of whether it was sparked by lightning or as part of a clear-cutting operation. Dead trees emit carbon dioxide as part of the decomposition process. See Deferral for C02 Emissions From Bioenergy and Other Biogenic Sources Under the Prevention of Significant Deterioration (PSD) and Title V Programs: Proposed Rule (“Proposed Deferral Rule”), 76 Fed.Reg. 15,249, 15,252-54 (Mar. 21, 2011).
*406 Significantly for the issue before us, biogenic carbon dioxide has a “unique role and impact ... in the carbon cycle.” Deferral Rule, 76 Fed.Reg. at 43,496. “Through relatively rapid photosynthesis, plants absorb C02 from the atmosphere and add it to their biomass, which contains roughly 50% carbon by weight, through a process called sequestration.” Proposed Deferral Rule, 76 Fed.Reg. at 15,252. Carbon dioxide emitted by fossil-fuel combustion is reabsorbed over millennia, leading to a long carbon “debt” period. By contrast, carbon dioxide released by biogenic sources will be sequestered when new plants are grown. The extent to which biogenic sources can serve as a carbon “sink” will depend on the type of source and its life cycle. See id. at 15,252-54. Given biogenic carbon dioxide’s role in the carbon cycle, many state and federal programs treat biofuels as “renewable resources and promote bioenergy projects when they are a way to address climate change.” Deferral Rule, 76 Fed.Reg. at 43,492. But to be clear, once carbon dioxide is released into the atmosphere, “it is not possible to distinguish between the radiative forcing associated with a molecule of C02 originating from a biogenic source and one originating from the combustion of fossil fuel.” Proposed Deferral Rule, 76 Fed.Reg. at 15,254. In layman’s terms, the atmosphere makes no distinction between carbon dioxide emitted by biogenic and fossil-fuel sources.
In the Tailoring Rule, EPA acknowledged that “biomass or biogenic fuels and feedstocks could play [a role] in reducing anthropogenic [greenhouse gas] emissions.” Tailoring Rule, 75 Fed.Reg. at 31,590-91. Yet responding to numerous requests that the Tailoring Rule exempt biogenic carbon dioxide emissions, EPA stated that because it “ha[d] not analyzed the administrative burden of permitting projects that specifically involve biogenic C02 emissions,” it would not take a “final position” on whether an exemption or “different treatment of biomass combustion” was warranted. Id. at 31,591. As a result, the Timing and Tailoring Rules require biogenic carbon dioxide sources to obtain PSD and Title V permits.
Shortly after promulgating the Tailoring Rule, EPA issued a Call for Information seeking technical and scientific information to “evaluate] different accounting approaches” for measuring biogenic carbon dioxide emissions. Call for Information: Information on Greenhouse Gas Emissions Associated with Bioenergy an Other Biogenic Sources, 75 Fed.Reg. 41,173, 41,-174 (July 15, 2010). Specifically, EPA sought information about how to treat biogenic carbon dioxide sources differently for purposes of measuring the emissions that trigger the PSD and Title V permitting programs. For example, EPA requested comments on how to “determin[e] the net impact on the atmosphere of C02 emissions” and the “appropriate spatial/geographic scale for conducting this determination.” Id. at 41,176. Then in March 2011, EPA, citing its ongoing efforts to understand the unique characteristics of biogenic carbon dioxide, issued a notice of proposed rulemaking seeking comment on whether it should defer regulation of these sources for a three-year period. See Proposed Deferral Rule, 76 Fed.Reg. at 15,251. Simultaneously, it published a guidance document for determining BACT for biogenic carbon dioxide emissions from “anyway” sources that were regulated under the PSD permitting program at Step One of the Tailoring Rule. See Office of Air and Radiation, U.S. EPA, Guidance for Determining Best Available Control Technology for Reducing Carbon Dioxide Emissions from Bioenergy Production (Mar.2011).
*407 Based on comments and studies received during the notice-and-comment period, and following up on the Call for Information, EPA issued a rule — the one challenged here — postponing regulation of biogenic carbon dioxide sources for three years. In support of this so-called Deferral Rule, EPA repeatedly emphasized that “the issue of accounting for the net atmospheric impact of biogenic C02 emissions is complex enough that further consideration ... is warranted.” Deferral Rule, 76 Fed.Reg. at 43,492. It explained:
The information collected to this point underscores the complexity and uncertainty associated with accounting for biogenic emissions of C02 and indicates that at present attempting to determine the net carbon cycle impact of particular facilities combusting particular types of biomass feedstocks would require extensive analysis and would therefore entail extensive workload requirements by many of the permitting authorities. In contrast to other sources of [greenhouse gas] emissions, these uncertainties and complexities are exacerbated because of the unique role and impact biogenic sources of C02 have in the carbon cycle. Further, methodologies are not sufficiently developed to assure that various permitting authorities would be able to perform the necessary calculations reasonably and consistently to determine the net atmospheric impact in many, if not all, instances.
Id. at 43,496. To dispel these uncertainties, EPA announced that “[d]uring the three-year deferral period” it would “conduct a detailed examination of the science associated with biogenic C02 emissions from stationary sources.” Id. at 43,492. EPA justified the Deferral Rule by invoking three principles of administrative law: the de minimis, one-step-at-a-time, and administrative necessity doctrines. See id. at 43,496-99. For instance, EPA reasoned that it would be a waste of resources to regulate a biogenic carbon dioxide source that has a de minimis impact on the net carbon cycle. See id. at 43,499.
The Deferral Rule exempts from regulation biogenic carbon dioxide sources that trigger the PSD and Title V permitting programs at Step Two of the Tailoring Rule. The rule accomplishes this by amending the regulatory definition of “greenhouse gases” to exclude biogenic carbon dioxide. Thus, biogenic carbon dioxide sources that have the potential to emit over the statutory thresholds, as modified by the Tailoring Rule, need not obtain a PSD or Title V permit. See id. at 43,493. The so-called “anyway” sources that obtained PSD and Title V permits during Step One of the Tailoring Rule, however, must still install BACT for their biogenic carbon dioxide emissions. See id. at 43,500-01.
The Deferral Rule contains a sunset provision: absent further agency action, on July 21, 2014, biogenic carbon dioxide will be regulated under the PSD and Title V programs, as modified by the Tailoring Rule. See id. at 43,490, 43,507. Although the Deferral Rule is a temporary regulation, it functions, in effect, as a permanent exemption from the PSD permitting requirement for any biogenic carbon dioxide source constructed during the three-year deferral period. See id. at 43,499. Exempted sources would have to obtain PSD permits only if they undertake a modification project after the deferral period ends. See id. The Deferral Rule is also voluntary. “Each state may decide if it wishes to adopt the deferral and proceed accordingly.” Id. at 43,502. At least one State, Massachusetts, is currently regulating biogenic carbon dioxide sources at Step Two of the Tailoring Rule. See Oral Arg. Tr. 3-4.
*408 Center for Biological Diversity and several other environmental organizations now petition for review. “We review the actions of the EPA to determine whether they are ‘(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations.’ ” American Farm Bureau Federation v. EPA, 559 F.3d 512, 519 (D.C.Cir.2009) (per curiam) (quoting 42 U.S.C. § 7607(d)(9)) (alternation in original).
II.
Before considering the merits of petitioners’ challenge, we must determine whether this case is ripe for review. See In re Aiken County, 645 F.3d 428, 434 (D.C.Cir.2011) (explaining that the “ripeness doctrine, even in its prudential aspect, is a threshold inquiry”). Under the prudential ripeness doctrine, invoked by our dissenting colleague, see dissenting op. at 419-20, courts look at two factors in deciding whether to stay their hand: the “fitness of the issues for judicial decision” and “the extent to which withholding a decision will cause hardship to the parties.” American Petroleum Institute v. EPA, 683 F.3d 382, 387 (D.C.Cir.2012) (internal quotation marks omitted).
The Deferral Rule satisfies the first factor because it functions as an exemption from the PSD permit requirement for those sources constructed during the deferral period. See supra at 407; Oral Arg. Tr. 13 (EPA conceding that the Deferral Rule permanently exempts sources constructed between July 2011 and July 2014). To be sure, once the deferral period ends, these sources’ “biogenic C02 emissions would have to be appropriately considered in any applicability determinations ... conducted] for future stationary source permitting purposes.” Deferral Rule, 76 Fed.Reg. at 43,499 (emphasis added). But under the PSD program, a source would be required to obtain a permit only for “a major modification determination.” Id. Given this, the question before us is whether EPA may exempt certain biogenic carbon dioxide sources — not just the air pollutant itself — from the PSD program. This is the type of “purely legal” and “sufficiently final” issue that is “fit[ ] ... for judicial decision” and can be resolved without resort to the prudential ripeness doctrine. American Petroleum Institute, 683 F.3d at 387 (internal quotation marks omitted).
Regarding the second factor, the parties will suffer hardship if we decline to decide this issue. We know from oral argument that a biogenic carbon dioxide source in Allendale, South Carolina, has been constructed without a PSD permit, meaning that it has emitted more pollution than it otherwise would have but for the Deferral Rule. See Oral Arg. Tr. 5-6, 10. There may well be other such sources. Our dissenting colleague principally relies on a March 2012 declaration for the proposition that the number of sources impacted by the Deferral Rule is negligible. But we have no idea how many biogenic carbon dioxide sources have been constructed since March 2012, nor do we have any basis for predicting how many biogenic carbon dioxide sources will be constructed during the next year. Because the Deferral Rule authorizes certain sources to emit more pollutants than they would otherwise be allowed to under the Tailoring Rule, this dispute is ripe for review.
III.
Petitioners argue that the Deferral Rule violates the Clean Air Act’s plain language. They rely on the statute’s defi *409 nition of “major emitting facility”: any “stationary sourcef ]” that “emit[s], or ha[s] the potential to emit,” certain specified amounts of “any air pollutant.” 42 U.S.C. § 7479(1). Because EPA regulates carbon dioxide as an “air pollutant,” petitioners contend that the agency has no authority to exempt any sources of carbon dioxide, including biogenic sources, from the PSD permitting program. Acknowledging the scientific uncertainty about biogenic carbon dioxide’s role in the carbon cycle, petitioners argue that EPA can regulate biogenic sources under the PSD permitting program while accounting for their unique qualities at the BACT stage. For its part, EPA believes that it has authority under the Clean Air Act to treat biogenic carbon dioxide sources differently because these sources have unique characteristics that were “unquestionably unforeseen when Congress enacted [the] PSD” program. Respondent’s Br. 40. This statutory analysis, however, appears nowhere in the Deferral Rule. Instead, the Deferral Rule rests on the de minimis, one-step-at-a-time, and administrative necessity doctrines. Because the “grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based,” SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943), the Deferral Rule must stand or fall on the merits of EPA’s invocation of these doctrines.
We can easily reject EPA’s use of the de minimis doctrine, which allows agencies to grant regulatory “exemption[s] when the burdens of regulation yield a gain of trivial or no value.” Alabama Power Co. v. Costle, 636 F.2d 323, 360-61 (D.C.Cir.1979). In the Deferral Rule, EPA stated that it had authority to exempt biogenic carbon dioxide sources that have “a negligible or positive impact on the carbon cycle and net atmospheric C02 levels.” Deferral Rule, 76 Fed.Reg. at 43,-499. In its appellate brief, however, EPA expressly disavows this doctrine, explaining that the Deferral Rule has a three-year sunset provision whereas the de minimis doctrine “is used to establish permanent exemptions.” Respondent’s Br. 35. Given this concession, the Deferral Rule cannot be sustained under the de minimis doctrine.
The one-step-at-a-time doctrine, which EPA does defend, authorizes agencies to promulgate regulations in a piecemeal fashion. EPA explains that it is proceeding one-step-at-a-time — that is, postponing regulation of biogenic carbon dioxide for three years-in order to give it time to study the science underlying these sources and determine its precise regulatory approach. See Deferral Rule, 76 Fed.Reg. at 43,497 (“EPA has ... defended] the applicability of PSD and Title V to biogenic emissions of C02 from stationary sources for only as long as necessary for EPA to complete the needed scientific study of these emissions, develop an accounting framework, and as appropriate conduct rulemaking specific to the unique nature and characteristics of these emission sources.”). According to petitioners, however, federal agencies have no authority to invoke the one-step-at-a-time doctrine “to diverge from [a] clear statutory mandate,” and here, they argue, the Clean Air Act unambiguously requires regulation of all carbon dioxide from whatever source. Petitioners’ Br. 56. But we need not decide whether the one-step-at-a-time doctrine can justify an agency’s non-compliance with a clear statutory mandate or whether the Clean Air Act unambiguously requires the regulation of all carbon dioxide from whatever source because, as we shall explain, EPA’s invocation of the one-step-at-a-time doctrine was arbitrary and capri *410 cious. See Grand Canyon Air Tour Coalition v. FAA, 154 F.3d 455, 477 (D.C.Cir.1998) (determining whether agency’s reliance on the one-step-at-a-time doctrine was arbitrary and capricious).
The one-step-at-a-time doctrine rests on the notion that “[s]ince agencies have great discretion to treat a problem partially, we [sh]ould not strike down [a regulation] if it [is] a first step toward a complete solution.” City of Las Vegas v. Lujan, 891 F.2d 927, 935 (D.C.Cir.1989). Eschewing a precise doctrinal test for invoking the doctrine, we have remarked that the one-step-at-a-time inquiry “is in essence a pragmatic one.” National Association of Broadcasters v. FCC, 740 F.2d 1190, 1210 (D.C.Cir.1984). We have observed that incremental regulation is especially appropriate in response to evolving economic and technological conditions. See id. at 1210-11. We have also imposed outer limits on the one-step-at-a-time doctrine: “it would be arbitrary and capricious for an agency simply to thumb its nose at Congress and say — without any explanation — that it simply does not intend to achieve a congressional goal on any timetable at all.” Grand Canyon Air Tour Coalition, 154 F.3d at 477. Although the “circumstances under which [an] agency may defer [regulation] ... are [incapable of being captured in a single doctrine,” National Association of Broadcasters, 740 F.2d at 1210, an agency invoking the one-step-at-a-time doctrine must, at a minimum, articulate (1) what it believes the statute requires and (2) how it intends to achieve that goal. Otherwise, reviewing courts will have no basis for evaluating whether the agency is in fact taking “a first step toward a complete solution.” City of Las Vegas, 891 F.2d at 935. EPA itself put it well: “Courts will accept an initial step towards full compliance with a statutory mandate, as long as the agency is headed towards full compliance.” Deferral Rule, 76 Fed.Reg. at 43,498.
In this case, however, EPA failed to explain in the Deferral Rule what “full compliance” with the “statutory mandate” means. Specifically, although the Deferral Rule spends pages explaining the scientific uncertainty about biogenic carbon dioxide sources, the additional research EPA plans to undertake, and why three more years of study are warranted, the rule — as opposed to EPA’s brief here — nowhere offers an interpretation of the Clean Air Act that would allow the agency to treat biogenic carbon dioxide sources differently. This deficiency is not merely the result of scientific uncertainty. For example, this would be a very different case had the Deferral Rule interpreted the Clean Air Act as requiring permits only for biogenic carbon dioxide sources with an adverse impact on the net carbon cycle and explained that the agency had deferred regulation due to scientific uncertainty over which sources meet that standard. Under those circumstances, we could have determined whether EPA had correctly interpreted the statute and properly invoked the one-step-at-a-time doctrine. Here, by contrast, we simply have no idea what EPA believes constitutes “full compliance” with the statute. In other words, the Deferral Rule is one step towards ... what? Without a clear answer to that question, EPA has no basis for invoking the one-step-at-a-time doctrine.
EPA next invokes the administrative necessity doctrine, which permits an agency to “avoid implementing a statute ... by showing that attainment of the statutory objectives is impossible.” Sierra Club v. EPA, 719 F.2d 436, 463 (D.C.Cir.1983). Under this doctrine, the agency must also adopt the narrowest feasible exemption. See id. (criticizing the agency *411 for failing to explore “less taxing ways to enforce the law”).
Emphasizing both the possibility that biogenic carbon dioxide sources might have a negligible impact on the net carbon cycle and the “extensive workload of processing permit applications,” EPA found that requiring permits for these sources “would frustrate the goals ... sought to [be] accomplished] in the Tailoring Rule.” Deferral Rule, 76 Fed.Reg. at 43,496. In doing so, EPA rejected a proposed middle-ground option: requiring biogenic carbon dioxide sources to obtain permits but only if they fail to make “any effort to take into account net carbon cycle impacts.” Id. Under this approach, all biogenic carbon dioxide sources that would have triggered the modified statutory thresholds would have had to take some steps to reduce their emissions, either voluntarily to avoid the PSD permit requirement or by installing BACT as a condition of obtaining a permit. EPA rejected this approach because it “could result in regulation of sources with trivial or positive impacts on the net carbon cycle.” Id.
Without deciding whether the middle-ground option could pass muster under the statute, we agree with petitioners that EPA’s rejection of that option was arbitrary and capricious. EPA has conceded “the possibility ... that more detailed examination of the science of biogenic C02 will demonstrate that ... some biogenic feedstocks ... have a significant impact on the net carbon cycle.” Id. at 43,498 (emphasis added). As to these sources, the middle-ground option would have had the practical effect of reducing their emissions; by contrast, the Deferral Rule, which functions as a permanent exemption, does not. EPA’s reason for rejecting the middle-ground option — that it would regulate biogenic sources with a trivial impact — though perhaps accurate, is thus non-responsive. Given EPA’s obligation to adopt the narrowest exemption possible, it should have explained why it rejected an option that would have reduced emissions from sources the Deferral Rule permanently exempts. See Sierra Club, 719 F.2d at 464 (remanding regulation because there was “no evidence that EPA ha[d] adequately explored ... regulatory alternatives”).
This omission is especially troublesome because EPA has demonstrated that, notwithstanding the scientific uncertainty about measuring biogenic carbon dioxide emissions at the PSD applicability stage, the unique characteristics of these sources can be factored in at the BACT stage. The Deferral Rule still requires “anyway” sources that obtained PSD permits under Step One of the Tailoring Rule to regulate biogenic carbon dioxide emissions. To assist those sources and permitting authorities in developing BACT standards, EPA issued a detailed thirty-three page report on biogenic carbon dioxide. Presumably, permitting authorities are able to handle the scientific complexity of regulating biogenic carbon dioxide as to these “anyway” sources. Furthermore, since the Deferral Rule is voluntary, States may regulate biogenic carbon dioxide sources under Step Two of the Tailoring Rule. Indeed, Massachusetts is currently doing just that.
Finally, for the first time in its brief, EPA relies on the absurd results doctrine, which embodies “the long-standing rule that a statute should not be construed to produce an absurd result.” Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1068 (D.C.Cir.1998). As EPA sees it, because “emissions of C02 derived from certain forms of biomass may not only fail to endanger public health and welfare, but in fact may benefit the public by reducing the net emissions of C02,” Respondent’s Br. 59, it would run *412 afoul of congressional intent to regulate them. Responding to petitioners’ contention that EPA’s reliance on the absurd results doctrine is post hoc, the agency-points to several passages in the Deferral Rule that mention the doctrine. These references fall into two groups. The first, and by far the larger, appears in a summary of the Tailoring Rule’s legal reasoning. According to EPA, the Deferral Rule fully incorporates the Tailoring Rule’s rationales, including the absurd results doctrine. See Respondent’s Br. 59. But the Deferral Rule cannot rest on the Tailoring Rule’s invocation of the absurd results doctrine for a simple reason: the two rules are aimed at different absurd results. The Tailoring Rule was intended to alleviate the crushing administrative burden on permitting authorities and sources, see Tailoring Rule, 75 Fed.Reg. at 31,547; the Deferral Rule, by contrast, was intended to avoid regulation of biogenic carbon dioxide sources that have a negligible impact on the net carbon cycle. The second group, which appears in a section justifying the Deferral Rule itself, mentions the absurd results doctrine only by analogy to the de minimis and administrative necessity doctrines. These passing references, however, fall far short of satisfying EPA’s “fundamental” obligation to “set forth the reasons for its actions.” Northeast Maryland Waste Disposal Authority v. EPA, 358 F.3d 936, 949 (D.C.Cir.2004) (per curiam). For these reasons, we agree with petitioners that EPA’s reliance on the absurd results doctrine is indeed post hoc. See Calpine Corp. v. FERC, 702 F.3d 41, 46 (D.C.Cir.2012) (explaining that an “agency decision! ] may not be affirmed on grounds not actually relied upon by the agency”).
Because the Deferral Rule cannot be justified under any of the administrative law doctrines relied on by EPA, this opinion, contrary to our dissenting colleague’s suggestion, see dissenting op. at 419, leaves for another day the question whether the agency has authority under the Clean Air Act to permanently exempt biogenic carbon dioxide sources from the PSD permitting program. If and when EPA adopts a permanent exemption for some or all biogenic carbon dioxide sources, we will have the benefit of three years of scientific study, as well as fully briefed and contextualized arguments about EPA’s authority under the Clean Air Act.
IV.
For the foregoing reasons, we grant the petitions for review and vacate the Deferral Rule.

So ordered.