# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 9, 2021          Decided August 20, 2021

No. 20-1117

TRANSPORTATION DIVISION OF THE INTERNATIONAL
ASSOCIATION OF SHEET METAL, AIR, RAIL AND
TRANSPORTATION WORKERS, ET AL.,
PETITIONERS

v.

FEDERAL RAILROAD ADMINISTRATION AND UNITED STATES
DEPARTMENT OF TRANSPORTATION,
RESPONDENTS

———

On Petition for Review of an Order
of the Federal Railroad Administration

———

*Shawn M. McKinley* argued the cause for petitioners. On
the briefs were *Lawrence M. Mann*, *Kevin Brodar*, *Joshua D.
McInerney*, and *James Petroff*.

*Amanda L. Mundell*, Attorney, U.S. Department of Justice,
argued the cause for respondents. With her on the brief were
*Jeffrey Bossert Clark*, Acting Assistant Attorney General, *Abby
C. Wright*, Attorney, *Paul M. Geier*, Assistant General Counsel
for Litigation and Enforcement, U.S. Department of
Transportation, *Peter J. Plocki*, Deputy Assistant General
Counsel for Litigation and Enforcement, *Christopher S. Perry*,

Senior Trial Attorney, and *Rebecca S. Behravesh*, Senior Attorney, Federal Railroad Administration.

Before: RAO and WALKER, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: This case concerns a challenge to a risk reduction regulation promulgated by the Federal Railroad Administration. Petitioners—two labor unions and an association of attorneys representing railroad employees—raise several procedural and substantive challenges to the regulation, including that it is untimely; arbitrary, capricious, and contrary to law; and based on a study conducted by a biased contractor. Because petitioners' claims lack merit, we deny the petition for review.

I.

Pursuant to the Rail Safety Improvement Act of 2008 ("Act"), the Secretary of Transportation must promulgate regulations requiring certain railroad carriers to "develop a railroad safety risk reduction program … that systematically evaluates railroad safety risks on its system and manages those risks in order to reduce the numbers and rates of railroad accidents, incidents, injuries, and fatalities." Pub. L. No. 110-432, § 103(a), 122 Stat. 4848, 4853 (codified as amended at 49 U.S.C. § 20156(a)(1)(A)). Such regulations must be promulgated "[n]ot later than [four] years" from the date of enactment, 49 U.S.C. § 20156(a)(1), and must be completed no more than twelve months after they are initiated, *id.* § 20103(b). The Act also requires carriers to include within their safety programs a "fatigue management plan." *Id.* § 20156(d)(1)–(2), (f)(1). The Secretary delegated this regulatory authority to the Administrator of the Federal

Railroad Administration ("FRA"), which is an agency within the Department of Transportation.

As part of developing these regulations, the FRA was required to conduct a study to determine whether it is in the public interest to withhold from discovery in litigation information gathered for implementation or evaluation of a risk reduction program. *Id.* § 20119(a). Developing an effective risk reduction program plan requires railroads to compile information regarding safety issues—information that could be used against them in litigation. Congress authorized regulations to facilitate the withholding of safety information if the FRA determined in light of the study that it is "in the public interest, including public safety and the legal rights of persons injured in railroad accidents." *Id.* § 20119(b). The FRA selected the law firm Baker Botts to conduct the study regarding withholding of safety information in litigation. Baker Botts concluded in its final report that it is in the public interest to protect the safety information railroads gather for risk reduction programs from discovery and use in litigation.

Following a lengthy process of notice and comment, as well as multiple public hearings, in 2020 the FRA issued the Risk Reduction Program Final Rule, 85 Fed. Reg. 9262 (Feb. 18, 2020) (to be codified at 49 C.F.R. § 271.101 *et seq.*) ("RRP Rule"). The RRP Rule mandates that each qualifying railroad establish and implement a risk reduction program with specified requirements. 49 C.F.R. § 271.101. Notably, the FRA acknowledged that although the Act requires a risk reduction program to include a fatigue management plan, such plans were not addressed in this rulemaking and would be elaborated "in a separate rulemaking." RRP Rule, 85 Fed. Reg. at 9266.[1] The

---

[1] The FRA recently issued a notice of proposed rulemaking regarding fatigue management plans. *See* Fatigue Risk Management Programs for Certain Passenger and Freight Railroads, 85 Fed. Reg. 83,484 (proposed Dec. 22, 2020) (to be codified at 49 C.F.R. pts. 270–71).

FRA encouraged railroads "to address fatigue-related railroad safety issues" but explained that, until it issues a fatigue management final rule, it will approve a risk reduction program plan without a fatigue management plan as long as the plan meets all other requirements. *Id.*

Relying on the Baker Botts study and public comments, the RRP Rule also protects from discovery and admissibility in evidence specific safety information railroads "compiled or collected … solely for the purpose of planning, implementing, or evaluating a risk reduction program." 49 C.F.R. § 271.11. With respect to work Baker Botts had done advising railroads in the past, the FRA specifically stated that it found no "conflict or representation indicating that Baker Botts had a bias in favor of railroad management at the time of the study." RRP Rule, 85 Fed. Reg. at 9268 (citing 49 U.S.C. § 20119; 48 C.F.R. §§ 9.505–9.505-4, 9.508).

Petitioners—the Transportation Division of the International Association of Sheet Metal, Air, Rail and Transportation Workers; the Brotherhood of Locomotive Engineers and Trainmen; and the Academy of Rail Labor Attorneys—timely petitioned for review of the RRP Rule. *See* 28 U.S.C. § 2342(7) (providing courts of appeals exclusive jurisdiction to review "all final agency actions described in" 49 U.S.C. § 20114(c), which includes final actions of the Secretary of Transportation regarding railroad safety).

## II.

Petitioners assert the RRP Rule must be set aside as arbitrary, capricious, and contrary to law because: (1) the FRA failed to promulgate the risk reduction regulation in accordance with statutory deadlines; (2) the FRA's decision to address fatigue management plans in a separate rulemaking was arbitrary, capricious, and contrary to law; (3) the FRA's use of performance-based standards contravenes the statutory

requirement to prioritize safety, 49 U.S.C. § 103(c); (4) the regulation's information protection provision also fails to prioritize safety; and (5) the FRA failed to comply with conflict-of-interest regulations when selecting Baker Botts to conduct the study. Petitioners also argue that the court should compel the FRA to add certain documents to the administrative record, such as the FRA's correspondence with Baker Botts.

Pursuant to the Hobbs Act, we analyze final agency actions of the Department of Transportation using the standards articulated in the Administrative Procedure Act ("APA"). *BNSF Ry. Co. v. U.S. Dep't of Transp.*, 566 F.3d 200, 203 (D.C. Cir. 2009); *see* 28 U.S.C. § 2342(7). The APA directs courts to "set aside agency action" if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We must ensure the FRA has "reasonably explain[ed]" its regulatory actions and conclusions. *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 115 (D.C. Cir. 2020).

A.

Petitioners argue the RRP Rule was untimely because it was issued nine years after the advance notice of proposed rulemaking and five years after the notice of proposed rulemaking. Regulations in this area must be completed no more than twelve months after the notice of rulemaking. 49 U.S.C. § 20103(b); *see also* 49 C.F.R. § 211.13. There is no dispute the FRA missed the twelve-month window to promulgate the RRP Rule. Petitioners assert that the Rule must be vacated because it is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

Missing this procedural deadline, however, does not require vacating the rule. Issuing the regulation more than one year after its initiation did not deprive the FRA of its statutory authority. *See Dolan v. United States*, 560 U.S. 605, 610–11

(2010) (explaining that although some statutory deadlines are jurisdictional, others simply "seek[] speed by creating a time-related directive," and those deadlines "do[] not deprive a … public official of the power to take the action to which the deadline applies if the deadline is missed"). "[T]he Supreme Court has declined to treat a statutory direction that an agency "'shall" act within a specified time, without more, as a jurisdictional limit precluding action later.'" *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 154 (D.C. Cir. 2010) (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 158 (2003)).

Although the Act uses language suggesting the deadline is mandatory—the FRA "shall prescribe regulations" within twelve months of initiating the rulemaking, 49 U.S.C. § 20103(b)—the failure to satisfy a timing requirement does not necessarily require vacatur. When the statute does not specify the consequences for missing a deadline, the Supreme Court "has looked to statutory language, to the relevant context, and to what they reveal about the purposes that a time limit is designed to serve." *Dolan*, 560 U.S. at 610. "[I]f a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." *Barnhart,* 537 U.S. at 159 (cleaned up). Nothing in the Act suggests that vacatur should be the remedy for the agency's failure to wrap up a regulatory action within twelve months. *Cf. Monroe Energy, LLC v. EPA*, 750 F.3d 909, 919–20 (D.C. Cir. 2014) (declining to vacate a final rule where an agency did not meet its statutory deadline absent evidence Congress intended otherwise); *Nat'l Petrochemical & Refiners Ass'n*, 630 F.3d at 155–56, 158 (same).

When Congress provides a procedural requirement such as a short period for rulemaking, it indicates that the agency should move with dispatch. The ordinary remedy for tardiness

is to seek an order to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004) (explaining that "when an agency is compelled by law to act within a certain time period," and the agency fails to do so, "a court can compel the agency to act"). But even as the rulemaking dragged on, petitioners did not bring such an action.

We decline to vacate the RRP Rule, mandated by Congress to improve rail safety, merely because the agency missed the twelve-month window for completing the rulemaking.[2]

## B.

Petitioners next argue that the failure to develop the requirements for a fatigue management plan in the RRP Rule violated the Act because risk reduction programs must include "a fatigue management plan that meets the requirements of [Section 20156(f)]." 49 U.S.C. § 20156(d)(2). Moreover, petitioners maintain the FRA did not articulate adequate reasons for regulating fatigue management plans separately, and thus its decision was arbitrary and capricious. Petitioners' argument is unavailing.

Agencies do not ordinarily have to regulate a particular area all at once. We have recognized that, under the

---

[2] Petitioners also suggest the regulation is untimely because it was not promulgated within four years of passage of the Act. But petitioners forfeited this argument by making only a skeletal assertion in a footnote. *See CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("A footnote is no place to make a substantive legal argument on appeal; hiding an argument there and then articulating it in only a conclusory fashion results in forfeiture."). In any event, it would fail for the same reason their other timeliness argument fails—namely, non-compliance with the deadline does not strip the FRA of its authority to promulgate the regulation.

"pragmatic" one-step-at-a-time doctrine, "agencies have great discretion to treat a problem partially" and "regulat[e] in a piecemeal fashion." *Ctr. for Biological Diversity v. EPA*, 722 F.3d 401, 409–10 (D.C. Cir. 2013) (cleaned up); *cf. Massachusetts v. EPA*, 549 U.S. 497, 524 (2007) (recognizing that "[a]gencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop"). Thus, courts "should not strike down a regulation if it is a first step toward a complete solution." *Ctr. for Biological Diversity*, 722 F.3d at 410 (cleaned up). "[I]t would be arbitrary and capricious," however, "for an agency simply to thumb its nose at Congress and say—without any explanation—that it … does not intend to achieve a congressional goal on any timetable at all." *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 477 (D.C. Cir. 1998). For the one-step-at-a-time doctrine to apply, the FRA must at least "articulate (1) what it believes the statute requires and (2) how it intends to achieve that goal." *Ctr. for Biological Diversity*, 722 F.3d at 410.

The FRA reasonably explained its decision to regulate in a piecemeal fashion. The FRA acknowledged the statutory requirement that a risk reduction program "must include a fatigue management plan … that meets the requirements of section 20156(f)" and elaborated on the status of the "related" fatigue management plan rulemaking. RRP Rule, 85 Fed. Reg. at 9266. The FRA explained it was considering the recommendations of the fatigue management working group and was developing a separate regulation to address fatigue management "with the assistance of industry stakeholders." *Id.* at 9274. Moreover, "any fatigue management plans that [the] FRA requires … would be part of a railroad's overall [risk reduction program]." *Id.* Several months later, the FRA issued a fatigue management plan notice of proposed rulemaking.

The RRP Rule was only "an initial step towards full compliance with a statutory mandate," and the agency was

"headed towards full compliance." *Ctr. for Biological Diversity*, 722 F.3d at 410 (cleaned up); *see also Grand Canyon Air Tour Coal.*, 154 F.3d at 478 (finding a rule was not arbitrary and capricious because it would achieve the statutory mandate in conjunction with other proposed rules within a reasonable timeframe). Moreover, nothing in the Act prohibits the FRA from implementing the risk reduction program regulations in a piecemeal fashion. The FRA's decision to regulate incrementally in the complex and technical area of railroad safety is not arbitrary and capricious.

Petitioners also suggest the regulation is contrary to law because the Act requires that a fatigue management plan be a part of any risk reduction program, yet the piecemeal regulation means that risk reduction program plans that do not include a fatigue management plan may be approved. But the FRA recognizes the statute requires such plans and is working to promulgate a substantive rule governing them. Furthermore, as the FRA explained, "[a] railroad may … elect to use processes and procedures in its [risk reduction program] plan to address fatigue-related railroad safety issues." RRP Rule, 85 Fed. Reg. at 9266. Apparently railroads are not prevented from including a fatigue management plan in their risk reduction program plans, which are submitted to the FRA for review and approval.

As a practical matter, the FRA has proceeded slowly, but apparently in good faith, as evidenced by its issuance of a notice of proposed rulemaking regarding fatigue management plans. We see no reason to send the agency back to the drawing board simply because the fatigue management plans will be articulated in a subsequent rulemaking.

## C.

Petitioners next point to the Act's requirement that "[i]n carrying out its duties, the [FRA] shall consider the assignment and maintenance of safety as the highest priority." 49 U.S.C.

§ 103(c). They argue the FRA failed to place the highest priority on safety because the RRP Rule uses performance-based standards and protects some safety information from being used against the railroads in litigation.

1.

With respect to the adoption of performance-based standards, petitioners maintain these standards depend on the FRA's ability to monitor railroads' performance, and the FRA historically has not conducted adequate oversight. In the absence of necessary oversight, petitioners argue the FRA's use of performance-based standards conflicts with the statutory requirement to prioritize safety.

Despite petitioners' many general criticisms of the agency, the FRA's explanation for using performance-based standards in the RRP Rule is consistent with consideration of "safety as the highest priority." 49 U.S.C. § 103(c). The FRA explained performance-based standards were appropriate because railroads have different operating systems and resources. RRP Rule, 85 Fed. Reg. at 9272. And performance-based standards offer flexibility for a railroad "to tailor [risk reduction program] requirements to its specific operations." *Id.* Accordingly, the FRA advised that it would not mandate "use [of] a specific hazard analysis tool or … implementation of a certain mitigation strategy to address a risk," but would apply "minimum Federal standards" to "[h]ow a railroad prepares, adopts, and implements" a risk reduction program. *Id.* at 9273. Rather than prescribe one-size-fits-all requirements, the FRA reasoned that performance-based standards allow railroads to determine the details of how they will meet safety requirements.

The FRA provided ample support for how a performance-based approach would improve railway safety. While economists and policymakers may debate the relative merits of

prescriptive and performance-based regulations, the FRA reasonably explained its policy choice, and nothing in the Act suggests that a performance-based regulatory standard is inconsistent with prioritizing safety.

2.

Petitioners argue the information protection provision similarly fails to prioritize safety as required by the Act. The RRP Rule protects from discovery and admissibility in litigation specific safety information railroads "compiled or collected … solely for the purpose of planning, implementing, or evaluating a risk reduction program." 49 C.F.R. § 271.11(a). Petitioners assert the provision enables railroads to mask safety issues, which impinges upon the rights of people injured in railroad accidents.

Once again, we see no inconsistency between the FRA's regulatory choice and prioritizing safety. As the FRA explained, a risk reduction program's success depends on a railroad's systematic and candid assessment of safety hazards. RRP Rule, 85 Fed. Reg. at 9263. After reviewing the public comments and Baker Botts' final report, the FRA recognized that "a railroad may be reluctant to reveal such hazards and risks [in its risk reduction program] if there is the possibility that such information may be used against it in a court proceeding for damages." *Id.* The FRA concluded that protecting certain information encourages candor from the railroads and facilitates opportunities to improve safety. Moreover, the protection is limited—it covers only "information a railroad compiles or collects *solely* to plan, implement, or evaluate" a risk reduction program. *Id.* (emphasis added). The FRA's regulatory protection is also in line with statutory limitations on the disclosure or use of specific safety-related information in other federal programs. *See, e.g.*, 23 U.S.C. § 409 (protecting safety-related information provided to the Federal Highway Administration);

12

49 U.S.C. § 20118(a) (creating a Freedom of Information Act exemption for specific safety-related information provided to the FRA).

Exercising its expertise, the FRA made a considered and reasonable choice that protecting the information in litigation would encourage greater railroad safety improvements. Petitioners may disagree with the FRA's assessment of what policies prioritize safety, but that disagreement does not make the regulation contrary to law.

## D.

Petitioners next claim the RRP Rule should be vacated because the FRA failed to perform proper conflicts checks before selecting Baker Botts to undertake the study regarding whether and how to protect the safety information in litigation against railroads. Petitioners also argue the FRA must supplement the administrative record by including documents relating to the FRA's selection of and correspondence with Baker Botts to perform the study.

## 1.

Petitioners maintain the FRA did not investigate whether Baker Botts had a conflict of interest and inappropriately considered Baker Botts' "biased study" when formulating the RRP Rule. Petitioners further assert the FRA did not explain how it complied with conflict-of-interest regulations and thus "fail[ed] to offer a 'genuine explanation' for its decision-making in violation of the APA." Petitioners focus on Baker Botts' bias in favor of railroad management and the firm's "cultural and historic bias against … unions and the personal injury claims brought by their members against the railroads."

The Federal Acquisitions Regulations require agencies to avoid and mitigate potential conflicts of interest when contracting with third parties in order to "[p]revent[] the

existence of conflicting roles that might bias a contractor's judgment." 48 C.F.R. § 9.505(a). "Each individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract." *Id.* § 9.505. The regulation demands "[t]he exercise of common sense, good judgment, and sound discretion … in both the decision on whether a significant potential conflict exists and … the development of an appropriate means for resolving it." *Id.*

In the RRP Rule, the FRA explained that "in selecting Baker Botts and conducting the study," "it complied with all legal requirements, including … the Federal Acquisitions Regulations." 85 Fed. Reg. at 9268. Moreover, the agency's review did not reveal "any conflict or representation indicating that Baker Botts had a bias in favor of railroad management at the time of the study." *Id.* The FRA acknowledged "that Baker Botts represented Southern Pacific railroad beginning in the late 1800s until sometime in the 1900s," but it determined the record included no "example of Baker Botts representing a railroad at the time of the study." *Id.* The FRA also noted Baker Botts was involved in litigation related to a 2013 rail accident, but explained that this litigation occurred after the firm had finished the study. Additionally, the FRA explained that Baker Botts had completed its own conflict check when submitting its proposal and "only found one matter involving advice it provided to a railroad on environmental issues, not rail safety." *Id.*

The FRA considered the comments and engaged in reasoned decisionmaking when determining Baker Botts had no conflict that would bias its undertaking the study.

2.

Petitioners ask this court to require the FRA to include in the administrative record "all correspondence and electronic communications between Baker Botts and the FRA up until the

issuance of the [f]inal [r]ule" and also the proposals from four individuals and organizations (including Baker Botts) seeking the FRA contract for the information protection study.

As a "general rule," "[t]he APA limits judicial review to the administrative record." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010). The FRA must include in the administrative record "any findings or report on which [the final rule] is based." FED. R. APP. P. 16(a)(2); *see* 28 U.S.C. § 2112(b). An agency's "designation of the Administrative Record … is entitled to a presumption of administrative regularity." *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019) (cleaned up). "[P]redecisional and deliberative documents are not part of the administrative record," *id.* (cleaned up), and will be excluded absent "independent evidence of improper conduct" by the agency that would constitute "'a strong showing of bad faith or improper behavior.'" *San Luis Obispo Mothers for Peace v. NRC*, 789 F.2d 26, 44 (D.C. Cir. 1986) (en banc) (plurality opinion) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)).

Petitioners have not provided any evidence to overcome the presumption of administrative regularity. The FRA maintains that when promulgating the RRP Rule, it did not consider any of the documents petitioners seek to include. Petitioners offer no explanation of why or how the three rejected proposals, Baker Botts' proposal, or the correspondence between Baker Botts and the FRA prior to issuance of the RRP Rule would have informed the FRA's decisionmaking. Petitioners' bald assertions that the requested documents "are an important part of the administrative record" and that they "were necessarily relied upon by the FRA" are not enough.

Moreover, with respect to the FRA's communications with Baker Botts regarding the study, the FRA explains they "are

not part of the administrative record because they reflect the agency's internal deliberations." Petitioners do not contest the correspondence is deliberative. They instead point to Baker Botts' labor relations practice and previous representation of railroads. These facts, however, are not "independent evidence of improper conduct" by the FRA that would constitute "a strong showing of bad faith or improper behavior" sufficient to overcome the exclusion of deliberative documents from the record. *San Luis Obispo*, 789 F.2d at 44 (cleaned up). Petitioners have not demonstrated the type of impropriety that would require the FRA to include in the administrative record the deliberative communications with Baker Botts.

Petitioners' allegations of bias neither justify vacatur of the RRP Rule nor require ordering the agency to include additional documents in the administrative record.

\* \* \*

For the foregoing reasons, we find that none of Petitioners' claims warrant setting aside the RRP Rule, and we deny the petition for review.

*So ordered.*