# United States Court of Appeals for the Federal Circuit

---

**VETERAN WARRIORS, INC., ANDREW D. SHEETS, KRISTIE SHEETS,**
*Petitioners*

**v.**

**SECRETARY OF VETERANS AFFAIRS,**
*Respondent*

---

2021-1378

---

Petition for review pursuant to 38 U.S.C. Section 502.

---

Decided: March 25, 2022

---

TIMOTHY Q. LI, Sidley Austin LLP, New York, NY, argued for petitioners. Also represented by MICHAEL R. FRANZINGER, Washington, DC; BARTON FRANK STICHMAN, I, National Veterans Legal Services Program, Washington, DC.

SOSUN BAE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by BRIAN M. BOYNTON, CLAUDIA BURKE, PATRICIA M. MCCARTHY.

---

Before MOORE, *Chief Judge*, REYNA and CHEN, *Circuit Judges*.

MOORE, *Chief Judge*.

Veteran Warriors, Inc., Andrew D. Sheets, and Kristie Sheets (Petitioners) petition for review of a final rule promulgated by the Department of Veterans Affairs.[1]   They claim seven parts of that rule are invalid under the two-step framework set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  The government challenges Petitioners' standing.  For the following reasons, we dismiss in part, grant in part, and deny in part the petition.

## BACKGROUND

In 2010, Congress enacted the Caregivers and Veterans Omnibus Health Services Act, Pub. L. No. 111-163, 124 Stat. 1130 (Caregivers Act) (codified in scattered sections of title 38).  That Act required the VA to establish two programs, both of which were designed to help individuals who provide eligible veterans with personal care services.  One program provided assistance to family caregivers—individuals who provide veterans with personal care services and who are related to or live with those veterans.  38 U.S.C. § 1720G(a) (detailing the family caregivers program).  The other program provided assistance to general caregivers— other individuals who provide veterans with personal care services.  *Id.* § 1720G(b) (detailing the general caregivers program).  To implement these programs, the VA promulgated a series of regulations.  38 C.F.R. pt. 71 (2015).

In 2018, Congress amended the Caregivers Act.  *See* John S. McCain III, Daniel K. Akaka, and Samuel R.

---

[1]    The parties do not identify any relevant distinction between the VA and the Secretary of Veterans Affairs. Therefore, we refer to them collectively as the VA.

Johnson VA Maintaining Internal Systems and Strengthening Integrated Outside Networks Act, Pub. L. No. 115-182, 132 Stat. 1393 (VA MISSION Act). The VA MISSION Act expanded the class of veterans who qualify as eligible under the family caregivers program. For example, the program now applies to all veterans regardless of their service dates, and there are new avenues for a veteran to qualify as eligible for benefits. *Id.* § 161, 132 Stat. at 1438–40.

To implement the VA MISSION Act and further improve the family caregivers program, the VA overhauled its regulations. Program of Comprehensive Assistance for Family Caregivers Improvements and Amendments Under the VA MISSION Act of 2018, 85 Fed. Reg. 46,226 (July 31, 2020) (*Final Rule*) (to be codified at 38 C.F.R. pt. 71); *see also* Program of Comprehensive Assistance for Family Caregivers Improvements and Amendments Under the VA MISSION Act of 2018, 85 Fed. Reg. 13,356 (proposed Mar. 6, 2020) (*Proposed Rule*) (to be codified at 38 C.F.R. pt. 71). In general, the VA attempted to clarify, streamline, and regularize its implementation of the Caregivers Act.

Veteran Warriors (a veterans advocacy organization), Andrew Sheets (an eligible veteran), and Kristie Sheets (Mr. Sheets' caregiver) petition for review of seven parts of the Final Rule. They challenge six definitions in 38 C.F.R. § 71.15 and the residency requirement imposed in 38 C.F.R. § 71.10(b). The government contests Petitioners' standing.

DISCUSSION

I. Standing

Veteran Warriors claims associational standing to challenge the Final Rule. To succeed in that claim, Veteran Warriors must prove (1) "its members would otherwise have standing to sue in their own right," (2) "the interests it seeks to protect are germane to [its] purpose," and (3) "neither the claim asserted nor the relief requested

requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). And it must do so for each challenged portion of the Final Rule. *See Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 981 F.3d 1360, 1370 (Fed. Cir. 2020) (en banc) (noting that standing must be shown for "the particular challenged rule"); *Mil.-Veterans Advoc. v. Sec'y of Veterans Affs.*, 7 F.4th 1110, 1122–32 (Fed. Cir. 2021) (assessing standing on a challenge-by-challenge basis).

In large part, Veteran Warriors has carried its burden to prove standing. It provided a declaration from Donald Lewis, who has standing to challenge three aspects of the Final Rule. Pet'rs' Reply Br. Ex. 1; *see also* Government's Suppl. Br. Ex. A ¶ 3 (noting that Mr. Lewis was denied benefits based on the VA's definitions for "in need of personal care services," "inability to perform an activity of daily living," and "need for supervision, protection, or instruction"). It has also proven that Mr. and Ms. Sheets have standing to challenge a fourth aspect of the Final Rule—tying benefit amounts to the GS scale.[2] Pet'rs' Reply Br. Ex. 6; *see* Government's Suppl. Br. Ex. A ¶ 8 (noting that Ms. Sheets' monthly stipend was reduced when the VA adopted the GS scale). Likewise, Veteran Warriors has shown that Timothy Chilson can challenge the Final Rule's definition of "serious injury." Mr. Chilson's 60-percent disability rating prevents him from having a "serious injury" under the Final Rule, despite his need for personal care services. Pet'rs' Reply Br. Ex. 8 ¶¶ 4, 7. Veteran Warriors has also identified one of its members who has standing to challenge the residency requirement, John Reay. *Id.* Ex. 5; *see also* Government's Suppl. Br. Ex. A ¶ 7 (noting VA denied Mr. Reay benefits based on that requirement). In addition, Veteran

---

[2]   Accordingly, the Sheets have standing to proceed as individual petitioners.

Warriors has proven that Jason Wright has standing to challenge part of the Final Rule's definition of "unable to self-sustain in the community," specifically the portion that depends on a veteran being in need of continuous supervision, protection, or instruction. Pet'rs' Reply Br. Ex. 7 ¶¶ 6–7; *see also* Government's Suppl. Br. at 8. Each of these challenges is germane to Veteran Warriors' purposes as a veterans advocacy organization, and no challenge requires the involvement of an individual member. Thus, Veteran Warriors has proven all three prongs of associational standing for these challenges.

But Veteran Warriors has not carried its burden to prove standing for part of its challenge to the Final Rule's definition of "unable to self-sustain in the community." No declarant has standing to challenge the "three or more activities of daily living" pathway for satisfying that definition. Mr. Wright's declaration is limited to his need for supervision, protection, or instruction. Pet'rs' Reply Br. Ex. 7 ¶ 6–7. Monet Gay has died, preventing her declaration from supporting standing. Government's Suppl. Br. at Ex. A ¶ 4. Todd Servello, Pet'rs' Reply Br. Ex. 3 ¶ 7, and Kaitlyn Laycoax, *id.* Ex. 4 ¶ 7, claim a need for assistance with all their activities of daily living, undermining any claim of injury in fact. If those allegations are true, Mr. Servello and Ms. Laycoax would be entitled to full benefits regardless of the VA's "three or more" language. Without an individual member who would have standing to sue in his own right, Veteran Warriors cannot establish associational standing for this challenge. Thus, we dismiss Petitioners' challenge to the "three or more activities of daily living" requirement for a veteran to qualify as unable to self-sustain in the community.[3]

---

[3]    Petitioners sought leave to file certain supplemental declarations. Because we need not rely on those

## II. Merits

Congress delegated the VA authority to "establish a program of comprehensive assistance for family caregivers of eligible veterans." *See* 38 U.S.C. § 1720G(a)(1)(A). We must, therefore, defer to VA regulations interpreting the statutory framework. *See United States v. Mead Corp.*, 533 U.S. 218, 229 (2001) (deferring when "Congress would expect the agency to be able to speak with the force of law"). And we do so under the two-step framework set forth in *Chevron*, 467 U.S. at 842–43. Step one asks "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter," and we "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If, however, "the statute is silent or ambiguous with respect to the specific issue," we proceed to step two of the *Chevron* framework, at which we determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

Petitioners challenge seven parts of the Final Rule. For each challenge, they claim the regulatory text is both inconsistent with and an unreasonable interpretation of the statutory framework. The government, for its part, defends the VA's regulations as reasonable interpretations of statutory silence or ambiguity. We take each challenge in turn.[4]

---

declarations and because they do not speak to the "three or more" requirement, we deny Petitioners' motion as moot.

[4] At various points, Petitioners argue any silence or ambiguity in the statute must be resolved in the veteran's favor. *See Brown v. Gardner*, 513 U.S. 115, 118 (1994) (reciting "the rule that interpretive doubt is to be resolved in the veteran's favor"). But they fail to develop those

A. In Need of Personal Care Services

Petitioners' first challenge is aimed at the VA's definition of "in need of personal care services." *See* 38 C.F.R. § 71.15. The phrase "in need of personal care services" appears only once in the statute:

(2) For purposes of this subsection, an eligible veteran is any individual who . . .

(C) is *in need of personal care services* because of—

(i) an inability to perform one or more activities of daily living;

(ii) a need for supervision or protection based on symptoms or residuals of neurological or other impairment or injury;

(iii) a need for regular or extensive instruction or supervision without which the ability of the veteran to function in daily life would be seriously impaired; or

(iv) such other matters as the Secretary considers appropriate.

38 U.S.C. § 1720G(a) (emphasis added). A veteran who is "in need of personal care services" may qualify as an

---

arguments, just asserting the rule without explanation. *See, e.g.*, Pet'rs' Br. 43, 46, 48, 50, 53, 54, 57. Accordingly, we need not consider whether or how the pro-veteran canon applies in this case. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (when a party does not develop an argument, we treat that argument as waived).

"eligible veteran," thereby entitling his family caregivers to benefits. *Id.*

In the Proposed Rule, the VA read this language and the broader statutory context as creating a gap. 85 Fed. Reg. at 13,359. It concluded that Congress had not spoken to the meaning of "in need of personal care services," leaving that question to the VA. *Id.* The VA then filled that gap with a regulatory definition. *See* 38 C.F.R. § 71.15. Under § 71.15, a veteran is "in need of personal care services" when he "requires in-person personal care services from another person, and without such personal care services, alternative in-person caregiving arrangements (including respite care or assistance of an alternative caregiver) would be required to support the eligible veteran's safety."

Petitioners challenge the in-person requirement. They claim the VA's interpretation is inconsistent with the statutory text, which does not establish an in-person requirement. They also argue the VA's interpretation is unreasonable, preventing *Chevron* deference at step two. We do not agree.[5]

---

[5]    For this challenge and others, Petitioners suggest the questions at issue are of "deep "economic and political" significance," and thus, Congress would not have delegated to the VA authority to resolve them. Pet'rs' Reply Br. 12 (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)). But this is not one of the "extraordinary cases" contemplated in *King*, 576 U.S. at 485–86, to which the *Chevron* framework does not apply. The questions presented here do not approach the significance of the question presented in *King*— which involved billions of dollars and affected millions of people. *See* J.A. 396 (noting around 15,600 caregivers have been awarded benefits). Accordingly, we apply *Chevron* throughout.

### 1. Step One

Congress has not spoken to the precise interpretive question at issue in this challenge—whether a veteran must require in-person care to be "in need of personal care services." The statutory text does not address *where* personal care services must be provided; the statutory structure provides no additional clarity; and the legislative history does not evidence an unambiguous congressional intent for "in need of personal care services" to include remote care. Put simply, there is a gap in the statute.

We start with the meaning of "in need of personal care services." Congress defined part of that phrase, "personal care services," to mean:

> [S]ervices that provide the veteran the following:
>
> > (A) Assistance with one or more activities of daily living.
> >
> > (B) Supervision or protection based on symptoms or residuals of neurological or other impairment or injury.
> >
> > (C) Regular or extensive instruction or supervision without which the ability of the veteran to function in daily life would be seriously impaired.
> >
> > (D) Any other non-institutional extended care (as such term is used in section 1701(6)(E) of this title).

38 U.S.C. § 1720G(d)(4). This definition describes what services qualify as "personal care services"—for example, assistance with an activity of daily living. But it does not expressly describe where those services must be provided. That is, the definition does not directly speak to the interpretive question at issue here.

Nor can we infer an answer to the interpretive question at issue from that definition. Four subsections— § 1720G(d)(4)(A) through (D)—delineate the universe of services that qualify as "personal care services." If all of those subsections are unambiguously limited to in-person care, the statute would compel the VA's interpretation.[6] At least subsection (C), however, could be read broadly to include remote services. *Id.* § 1720G(d)(4)(C). Instruction and supervision—even if regular, extensive, and necessary for a veteran to function in daily life—conceivably could be administered remotely. A family caregiver could, for example, instruct a veteran to take life-saving medication over the phone multiple times a day. Under a broad interpretation of subsection (C), then, the veteran could be eligible based on a need for remote personal care services.

That said, the potential breadth of subsection (C)—or any other subsection that could be read to include remote services—does not compel Petitioners' interpretation. The vast majority of services that fit neatly within the statutory definition are administered in person. Assistance with activities of daily living—like bathing, toileting, and

---

[6]    The VA's interpretation would not be compelled if only a single subsection (or something less than all subsections) were limited to in-person care because the subsections are listed disjunctively, rather than conjunctively. To be sure, § 1720G(d)(4) does not use conjunctive ("and") or disjunctive ("or") language when listing the four statutory categories. Context, however, shows the disjunctive applies. The definition of "in need of personal care services" uses the disjunctive when listing subsections very similar to those listed in the definition of "personal care services." *Compare* 38 U.S.C. § 1720G(a)(2)(C) *with id.* § 1720G(d)(4). It would be inconsistent for Congress to use the disjunctive in § 1720G(a)(2)(C) while intending § 1720G(d)(4) to be conjunctive.

dressing—occurs mostly (if not exclusively) in person. *See* 38 U.S.C. § 1720G(d)(4)(A). *See generally* 38 C.F.R. § 71.15 (listing activities of daily living, including bathing, toileting, and dressing). Protection and supervision, while perhaps possible to provide remotely, are largely in-person forms of assistance. It would be difficult to protect or supervise a veteran over the telephone or a videocall. The nature of the services suggests that "personal care services" are meant to be in-person care. While subsections (A) through (D) are not unambiguously limited to in-person care, they do not unambiguously include remote care either. Ultimately, those categories do not provide an answer to the interpretative question at issue here.

Apart from the statutory definition, the ordinary meaning of the phrase "personal care services" does not clarify Congress' intent regarding where those services must be provided. No party has identified a relevant technical meaning for "personal care services." *See Van Buren v. United States*, 141 S. Ct. 1648, 1657 (2021) ("[C]ourts take note of terms that carry 'technical meanings.'"). And the word personal does not limit "personal care services" to those services administered in person. The VA identified two common meanings for that word: "done, made, or performed in person" and "[o]f or relating to a particular person." *See Proposed Rule*, 85 Fed. Reg. at 13,360 (quoting The American Heritage Dictionary of the English Language 1311 (4th ed. 2000)). In this context, however, the latter definition fits more naturally. The statute discusses various types of "services," of which "personal care services" is one example. *See, e.g.*, 38 U.S.C. § 1720G(a)(3)(A)(ii)(II) ("mental health services"); *id.* § 1720G(a)(3)(A)(ii)(VI)(aa) ("financial planning services"); *id.* § 1720G(a)(3)(A)(ii)(VI)(bb) ("legal services"); *id.* § 1720G(b) ("support services"). For the other uses of "services," the modifier describes *what* the services are, not *where* they are provided. Applied to "personal care services," that means the second definition—of or relating to

a particular person—controls.  Of the two definitions, it is the only one that speaks to what the services are; "personal care services" are services that relate to a particular veteran.  In short, the ordinary meaning of "personal care services" does not speak to where those services must be administered.

In addition to defining "personal care services," the statute describes which veterans qualify as "in need of personal care services."  *See* 38 U.S.C. § 1720G(a)(2)(C).  It does not, however, address the location of personal care services in that description.  In large part, § 1720G(a)(2)(C) parrots the language contained in the definition of "personal care services."  When it does use different language, the changes are minor.  For example, compare the relevant provisions' language regarding activities of daily living:

> [§ 1720G(d)(4):]    *"[P]ersonal care services"* . . . means services that provide . . . *assistance with* one or more activities of daily living.

> [§ 1720G(a)(2)(C):]  [A]n eligible veteran is any individual who . . . is *in need of personal care services* because of . . . *an inability to perform* one or more activities of daily living.

(emphases added).  The differences here show only what "in need of" means:  in this context, having "an inability to perform."  That does not speak to where personal care services are administered.  And the other statutory differences track this pattern, explaining what "in need of" means for each aspect of "personal care services."  Thus, the statutory description of "in need of personal care services" is also silent regarding where personal care services must be administered.

Accordingly, no part of "in need of personal care services" addresses whether personal care services must be provided in person. The statute defines "personal care services" and describes which veterans are "in need of

personal care services," but it says nothing about where those services must be provided. Still, we must consider the statutory context before concluding there is a statutory gap. *See Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 320 (2014) (noting words of a statute must be read in context); *cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) ("[A] court cannot wave the ambiguity flag just because it found the regulation impenetrable on first read."). The parties identify several provisions as relevant to where "personal care services" are administered, but no provision resolves the statutory silence.

First, the statutory definition of "family member" does not speak to where personal care services are administered. Family caregiver benefits are available only to a veteran's "family member[s]." And subsection (d)(3) defines who qualifies as a family member:

> The term "family member", with respect to an eligible veteran under subsection (a), means an individual who—
>
>> (A) is a member of the family of the veteran, including—
>>
>>> (i) a parent;
>>>
>>> (ii) a spouse;
>>>
>>> (iii) a child;
>>>
>>> (iv) a step-family member; and
>>>
>>> (v) an extended family member; or
>>
>> (B) lives with the veteran but is not a member of the family of the veteran.

Under this definition, a member of the veteran's family need not live with him to qualify for benefits. That does not, however, necessarily bring remote services within the scope of the phrase "personal care services." There is no statutory link between where a caregiver lives and where

personal care services are administered. So the former provides no insight into the latter.

Second, the general caregivers program allows for remote support services, but it says nothing about where personal care services are administered. The general caregivers program provides benefits, called support services, to veterans' caregivers. Those benefits include:

> (i) Services regarding the administering of personal care services, which, subject to subparagraph (B), shall include—
>
> > (I) educational sessions made available *both in person and on an Internet website*;
> >
> > (II) use of *telehealth* and other available technologies; and
> >
> > (III) teaching techniques, strategies, and skills for caring for a disabled veteran; . . . .

38 U.S.C. § 1720G(b)(3)(A)(i) (emphases added). While Congress expressly permitted *caregivers* to receive remote training and education, that says nothing about whether *veterans* can receive remote care from these caregivers. There is no statutory link between the location of support training services for the caregivers and the location of personal care services for the veterans. Thus, this provision does not fill the statutory silence regarding where personal care services are administered.

Nor does this provision turn that silence into a proscription, foreclosing the VA's interpretation because Congress called out "in-person" services in one provision while remaining silent in another. Congress expressly defined "support services" to include both in-person and remote services but remained silent with respect to "personal care services." It did so while delegating to the VA authority to "establish a program of comprehensive assistance for family caregivers of eligible veterans." 38 U.S.C.

§ 1720G(a)(1)(A).  This suggests Congress delegated the interpretive question here—where personal care services are administered—to the VA.  "[A] congressional mandate in one section and silence in another often suggests not a prohibition but simply a decision not to mandate any solution in the second context, i.e., to leave the question to agency discretion." *Catawba Cnty., N.C. v. E.P.A.*, 571 F.3d 20, 36 (D.C. Cir. 2009).

Third, the statutory stipend provisions do not address where "personal care services" are administered.  Primary family caregivers are entitled to a monthly stipend.  38 U.S.C. § 1720G(a)(3)(A)(ii)(V).  While Congress delegated to the VA authority to set the stipend amount, *see id.* § 1720G(a)(3)(C)(i), it provided certain guidelines.  One guideline uses "home health care" wages to set a minimum compensation level:

> The Secretary shall ensure, to the extent practicable, . . . that the amount of the monthly personal caregiver stipend . . . is not less than the monthly amount a *commercial home health care* entity would pay an individual in the geographic area of the eligible veteran to provide equivalent personal care services to the eligible veteran.

*Id.* § 1720G(a)(3)(C)(ii) (emphasis added).  But that is several steps removed from the question here:  where personal care services are administered.  It is less than clear that home health aides provide only in-person services.  And even if that were true, nothing in the statute requires a family caregiver to provide the same services that a home health aide provides.  Without these links, the stipend provision does not speak to where personal care services are administered.

Fourth, the availability of "in-home" respite care also does not fill the statutory gap.  In addition to a stipend, primary family caregivers are entitled to:

16                                    VETERAN WARRIORS, INC. v.
                                      SECRETARY OF VETERANS AFFAIRS

> [R]espite care of not less than 30 days annually, including 24-hour per day care of the veteran commensurate with the care provided by the family caregiver to permit extended respite.
>
> ***
>
> Respite care provided under subparagraph (A)(ii)(III) shall be medically and age-appropriate and include *in-home* care.

38 U.S.C. § 1720G(a)(3)(A)(ii)(III), 1720G(a)(3)(B) (emphasis added). The "in-home" language in this provision suggests that some respite care may be intended to replace in-person personal care services. But this does not mean personal care services must be administered in person. Respite care need only "include in-home" care; there is no suggestion that respite care must be limited to such care. A family caregiver may be providing only remote services, in which case in-person respite care may not be "commensurate with the care provided by [that] caregiver" or "medically . . . appropriate." *See id.* § 1720G(a)(3)(A)(ii)(III), 1720G(a)(3)(B). In such circumstances, remote respite care might be available. It is also possible for in-home respite care to be provided when the family caregiver only provided remote care, e.g., replacing phone call reminders with in-person reminders. At best, this subsection contemplates some in-person personal care services that will be replaced with in-person respite care. It does not, however, limit personal care services to in-person care.

Fifth, the VA's monitoring obligations do not limit "personal care services" to in-person care. As part of the family caregivers program, the VA must "monitor the well-being of each eligible veteran receiving personal care services" and "document each finding the Secretary considers pertinent to the appropriate delivery of personal care services to an eligible veteran under the program." 38 U.S.C. § 1720G(a)(9)(A)–(B). And it must "establish procedures" to satisfy those obligations that "*may* include . . . [v]isiting

an eligible veteran in the eligible veteran's home to review directly the quality of personal care services provided to the eligible veteran." *Id.* § 1720G(a)(9)(C)(i) (emphasis added). This language, at best, contemplates that some personal care services may be provided in person. Indeed, the VA could visit a veteran's home to observe how remote services are administered. The monitoring obligations do not answer the interpretive question here.

Separate from the text and structure of the statute, Petitioners claim § 1720G's history and purpose foreclose the VA's interpretation. They point to the VA MISSION Act as evidencing Congress' intent to expand benefits. Certainly, that Act expanded the definitions of "personal care services" and "in need of personal care services." *See id.* § 161, 132 Stat. at 1439–40. By doing so, it provided benefits to additional caregivers. But it did not speak to where personal care services must be administered for a caregiver to be entitled to benefits. Petitioners have shown nothing more than a vague congressional intent to expand benefits, and that cannot overcome the statutory silence. *See, e.g.*, *Hyundai Steel Co. v. United States*, 19 F.4th 1346, 1354–55 (Fed. Cir. 2021) (holding general statements in the legislative history did not express Congress' intent regarding the interpretive question at issue); *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1261 (11th Cir. 2020) (noting legislative history rarely speaks with sufficient clarity to resolve an interpretive question at step one).

All told, Congress has not spoken to the precise interpretive question at issue. The text and structure of the statute are silent. And the legislative history does not evidence Congress' clear intent. Thus, the *Chevron* step one analysis is not decisive, and we must continue on to step two.

### 2. Step Two

The VA's interpretation of the statutory silence—the in-person requirement promulgated in 38 C.F.R. § 71.15—

is a permissible construction of the statute.  That interpretation reflects the VA's reasonable policy judgment.  *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005) ("[W]e defer at step two to the agency's interpretation so long as the construction is a reasonable policy choice for the agency to make.").  And it does not conflict with the regulatory scheme.  Accordingly, we must defer to the VA's interpretation.

The VA promulgated its definition of "in need of personal care services" to clarify the bounds of the family caregivers program.  It explained how the regulatory definition of personal care services "does not delineate whether such services must be provided in person or can be provided remotely[.]" *Proposed Rule*, 85 Fed. Reg. at 13,359.  Looking to the statutory text, the VA found that the family caregivers program "was intended to provide assistance to [f]amily [c]aregivers who are required to be physically present to support eligible veterans in their homes." *Id.*; *accord Final Rule*, 85 Fed. Reg. at 46,228.  The VA, therefore, promulgated a definition of "in need of personal care services" that limited the family caregivers program to veterans who require in-person care.  It believed that definition "would reduce clinical subjectivity in [the family caregivers program's] eligibility determination[] and thereby improve consistency in the program." *Proposed Rule*, 85 Fed. Reg. at 13,359; *accord Final Rule*, 85 Fed. Reg. at 46,228.  It also noted how the definition of "in need of personal care services" supports the VA's decision to focus the family caregivers program "on eligible veterans with moderate [to] severe needs." *See Final Rule*, 85 Fed. Reg. at 46,228; *accord Proposed Rule*, 85 Fed. Reg. at 13,356.

This explanation shows the VA made a reasonable policy decision in promulgating its definition of "in need of personal care services."  It is reasonable for the VA to prefer clear, objective rules.  A clear rule can reduce costs, promote predictability, and ensure uniform application.  It is also reasonable for the VA to focus on veterans who have

moderate to severe needs. Indeed, the statutory text supports such a focus. 38 U.S.C. § 1720G(a)(2)(B) (restricting eligibility to veterans who have "serious injur[ies]"). And the VA's definition of "in need of personal care services" forwards both of those goals.

Petitioners claim the VA's definition of "in need of personal care services" is entitled to less deference under *Watt v. Alaska*, 451 U.S. 259, 273 (1981). But they have failed to make the predicate showing necessary for *Watt* to apply: that the "current interpretation [is] in conflict with [the VA's] initial position." *See id.* Until the VA promulgated its Final Rule, it had never considered where personal care services must be administered. Thus, there was no "initial position" to create a conflict, and *Watt* does not apply.

Petitioners also argue the VA has interpreted "personal care services" inconsistently between the family and general caregivers programs. Pet'rs' Reply Br. 10. But the VA has not interpreted "personal care services" to include remote care for the general caregivers program. Indeed, the VA has left that question open. *See Final Rule*, 85 Fed. Reg. at 46,229 (The "VA will consider whether changes to the regulations governing [the general caregiver program] are appropriate in the future."); *see also* Government's Resp. Br. at 22 (quoting *Proposed Rule*, 85 Fed. Reg. at 13,359). It defined where personal care services must be administered for the family caregivers program, but it did not address the general caregivers program. In effect, the VA provided a partial answer to the question of where personal care services must be administered. And the VA "ha[s] great discretion to treat a problem partially and regulate in a piecemeal fashion." *Transp. Div. of the Int'l Ass'n*

*of Sheet Metal, Air, Rail & Transp. Workers v. Fed. R.R. Admin.*, 10 F.4th 869, 875 (D.C. Cir. 2021).[7]

Ultimately, the VA's interpretation of the statutory silence is a permissible construction of the statute. The VA made a reasonable policy choice, and we must defer to that choice. We therefore deny the petition as to this portion of the Final Rule.[8]

## B. Serious Injury

Petitioners next challenge the VA's definition of "serious injury." 38 C.F.R. § 71.15. That phrase appears in the statutory provision defining "an eligible veteran":

> [A]n eligible veteran is any individual who . . . for assistance provided under this subsection [effective on certain dates] . . . has a *serious injury* (including traumatic brain injury, psychological trauma, or other mental disorder) incurred or

---

[7]    We understand the Petitioners' argument that, if the VA eventually answers that interpretive question differently for the general caregivers program, it may be an unreasonable interpretation of the statute. The statutory definition of "personal care services" applies to both the family and general caregivers program. 38 U.S.C. § 1720G(d)(4). And the general caregivers program, like the family caregivers program, is limited to those veterans "who need[] personal care services." *Id.* § 1720G(b)(2). But Petitioners have not identified a regulation adopting such an interpretation for the general caregiver program. So that question is not before us.

[8]    Because we set aside the VA's definition of "need for supervision, protection, or instruction," we need not address Petitioners' argument that definition conflicts with the VA's definition of "in need of personal care services."

aggravated in the line of [active] duty [during certain service dates]."

38 U.S.C. § 1720G(a)(2)(B) (emphasis added). Unless a veteran has a "serious injury," his family caregivers cannot receive benefits under § 1720G(a).

From 2011 through 2020, the VA defined "serious injury" as "any injury, including traumatic brain injury, psychological trauma, or other mental disorder, incurred or aggravated in the line of [active] duty [during certain services dates], that renders the veteran or servicemember in need of personal care services." *See* 38 C.F.R. § 71.15 (2011) (interim rule); 38 C.F.R. § 71.15 (2015) (final rule). As the VA recognized, this is "a virtually verbatim recitation of" the statutory language. Caregivers Program, 80 Fed. Reg. 1357, 1360 (Jan. 9, 2015).

In 2020, the VA revised its definition. *Proposed Rule*, 85 Fed. Reg. at 13,365. Because the prior definition had not "provid[ed] guidance or clarity" as to the meaning of "serious injury," the VA had problems implementing the family caregivers program. *Id.* at 13,365–66. To resolve those problems, the VA redefined "serious injury" to mean:

[A]ny service-connected disability that:

(1)  Is rated at 70 percent or more by VA; or

(2)  Is combined with any other service-connected disability or disabilities, and a combined rating of 70 percent or more is assigned by VA.

38 C.F.R. § 71.15.

Petitioners argue that redefinition is inconsistent with and an unreasonable interpretation of the statutory text. We do not agree.

### 1. Step One

Congress has not spoken to the interpretive question rasied in Petitioners' second challenge—the meaning of "serious injury" in § 1720G(a)(2)(B). Petitioners have not identified a definition for that phrase, and the surrounding text does not completely resolve its meaning. The text provides insight into the meaning of "injury," but not the meaning of "*serious* injury." The statute is ambiguous, and we must defer to the VA's resolution of that ambiguity.

The statutory text fails to provide a definition of "serious injury." That term is nowhere to be found in 38 U.S.C. § 1720G(d), the definitional section for the family caregivers program. In fact, no other provision in title 38 uses the phrase "serious injury." A slight variation—"seriously injured"—does appear in 38 U.S.C. § 3319(h)(5)(B). But that subsection just cross-references § 1720G(a) without further defining "serious injury" or "seriously injured." *Id.* § 3319(h)(5)(B). And no common meaning or dictionary definition for "serious injury" exists in the record before us. Accordingly, the phrase "serious injury," by itself, lacks definite meaning.

The surrounding statutory text, however, narrows the universe of permissible interpretations of "serious injury." Congress ensured that phrase would "includ[e] traumatic brain injury, psychological trauma, or other mental disorder." 38 U.S.C. § 1720G(a)(2)(B). Thus, "serious injury" must include more than just physical injuries; mental disorders can qualify as serious. And any interpretation of "serious injury" that excludes all mental disorders would be unreasonable.

At the same time, the statutory language does not require "serious injury" to include all "traumatic brain injur[ies], psychological trauma[s], [and] mental disorder[s]." *Cf. id.* Such an interpretation would lead to "unreasonable results." *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982) ("Statutes should be interpreted to avoid untenable

distinctions and unreasonable results whenever possible."). It would render the word serious meaningless for mental disorders—every mental disorder would qualify as a "serious injury" because every mental disorder would fall within the "other mental disorder" category. And it would create a disparity between the statute's treatment of physical and mental disorders. Only serious physical disorders, but every mental disorder, would render a veteran eligible under § 1720G(a)(2)(B).

Nor does the statutory text require "serious injury" to operate as a proxy for veterans who are "in need of personal care services." Though much of § 1720G(a) focuses on the need for personal care services, § 1720G(a)(2)(B) expressly requires veterans to also have incurred or aggravated a serious injury during active-duty service. Accordingly, "serious injury" must be distinct from personal care services. If not, the phrase "serious injury" would have no meaning.

For similar reasons, Petitioners' arguments for linking "personal care services" with "serious injury" based on the legislative history fail. They point to an Explanatory Statement from Senator Akaka that seems to equate "serious injury" with the need for personal care services. 156 Cong. Rec. S2566, S2567 (Apr. 22, 2010) ("Severely injured veterans are defined as those who need personal care services because . . . ."). But the statutory text makes clear that "serious injury" and "in need of personal care services" are separate requirements for a veteran to qualify as eligible. And the Explanatory Statement cannot overcome the enacted text. *E.g.*, *Church of Scientology of Cal. v. I.R.S.*, 792 F.2d 153, 162 (D.C. Cir. 1986) ("The factual inaccuracy in the case as originally presented to us shows the wisdom of relying upon the text and structure of the statute rather than this statement by a single senator as a means of ascertaining the Congress'[] intent.").

Likewise, the purpose of disability ratings—quantifying a veteran's impairment in earning capacity—does not

foreclose the VA's interpretation. Disability ratings "represent as far as can practically be determined the average impairment in earning capacity resulting from [service-connected] diseases and injuries and their residual conditions in civil occupations." 38 C.F.R. § 4.1. But that purpose does not prevent the VA from using disability ratings to define "serious injury." It is possible that *serious* injuries are those injuries that have a great impact on a veteran's earning capacity. Or, perhaps, disability ratings may serve as an easily administrable proxy for "serious injur[ies]" under the plain meaning of that phrase. Nothing in the statutory language, structure, or purpose forecloses that understanding of the word serious.

Finally, Congress' rejection of an amendment that would have limited the family caregivers program to those veterans who would otherwise need nursing home care does not foreclose the VA's interpretation. *See* 155 Cong. Rec. S11523-02 (Nov. 19, 2009). To be sure, a veteran's rating level factors into whether that veteran is entitled to nursing home care. 38 U.S.C. § 1710A. If the veteran has a 70 percent or greater disability rating and "is in need of" nursing home care, the VA must provide that care. But this does not equate eligibility under the family caregivers program to eligibility for nursing home care. In each instance, the veteran must also show he is in need of the particular care sought, either family caregiver benefits (*see* 38 U.S.C. § 1720G(a)(2)(C)) or nursing home care (*see* 38 U.S.C. § 1710A(a)(2)).

Ultimately, the phrase "serious injury" is ambiguous. It has no statutory definition, and the parties have not identified a common meaning for that phrase. The statutory context provides some insight into what "injury" means, but it does not clarify what injuries are serious. Implicitly, therefore, Congress delegated that question to the VA. In such circumstances, we must defer to the VA's interpretation of the statutory scheme.

### 2. Step Two

The VA's interpretation of "serious injury"—requiring a 70 percent disability rating—is a permissible construction of the statute. That interpretation reflects the VA's reasonable policy judgment. Accordingly, we must defer to the VA's interpretation. *See Brand X*, 545 U.S. at 986 (discussing step two).

The VA amended its definition of "serious injury" to ease administration of the family caregivers program. In the VA's view, its prior definition lacked clarity and led to "inconsistent eligibility determinations by VA providers." *Proposed Rule*, 85 Fed. Reg. at 13,365–66. Providers had interpreted the word injury differently, causing inequitable administration of the family caregivers program. *Id.* at 13,366. So the VA expanded its definition of "serious injury" to include all service-connected disabilities, regardless of whether the disability is an injury. *Id.* at 13,366–68. It noted how this definition would be "more objective, inclusive, and equitable," especially for the older veterans now included in the family caregivers program by virtue of the VA MISSION Act. *Id.* at 13,367–68. And it explained how the requirement that the injury be "incurred or aggravated in the line of duty in the active military, naval, or air service" is indistinguishable from the definition of service connection. *Proposed Rule*, 85 Fed. Reg. at 13,370 (citing 38 U.S.C. § 101(16)).

Also, to distinguish serious injuries from non-serious injuries, the VA required veterans to have a 70 percent or higher disability rating. *Id.* at 13,369. It believed this would help focus the family caregivers program on those veterans with moderate to severe needs. *Id.* And it assessed other rating levels—like 50, 60, and 100 percent—finding them either too restrictive or too lax. *Id.*; *see also Final Rule*, 85 Fed. Reg. at 46,248. Moreover, it noted how 98 percent of veterans who were participating in the family caregivers program at that time had a 70 percent or higher

rating. *Final Rule*, 85 Fed. Reg. at 46,248. Like the service-connected disability change, the VA believed adopting a 70 percent disability requirement "would provide a transparent and clearly defined standard that can be consistently applied throughout VA." *Proposed Rule*, 85 Fed. Reg. at 13,369.

Combined, these two changes decoupled the definition of "serious injury" from the definition of "in need of personal care services." *Proposed Rule*, 85 Fed. Reg. at 13,369–70. Now, "serious injury" has a definition of its own, rather than parroting the statutory language defining "in need of personal care services." The VA noted how this tracks the statutory structure, which lists "serious injury" and "in need of personal care services" requirements as separate conditions for a veteran to qualify as eligible. *Final Rule*, 85 Fed. Reg. at 46,246 (citing 38 U.S.C. § 1720G(a)(2)(B)–(C)). Again, the VA viewed this change as eliminating inconsistent administration caused by the complexity of conducting medical evaluations.

We cannot say the VA's definition of "serious injury" is an unreasonable policy choice. The VA redefined that phrase in an attempt to provide clarity, reduce inequity, and streamline administration. Those are, no doubt, reasonable policy goals. And Petitioners have not persuasively argued that the VA's definition of "serious injury" is an unreasonable effort at achieving those goals.

Instead, Petitioners argue the VA's "serious injury" definition is wholly unpersuasive and entitled to less deference under *Watt*, 451 U.S. at 273. This time, Petitioners have made the predicate showing necessary for *Watt* to apply: a conflict between the VA's current position and its initial position on the meaning of "serious injury." *See id.* But Petitioners overstate *Watt* given the Supreme Court's more recent precedent on changed interpretations.

"The Supreme Court has rejected the argument that an agency's interpretation is not entitled to deference because

it represents a sharp break with prior interpretations of the statute in question." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1322 (Fed. Cir. 2003) (internal quotation marks omitted). *Chevron* itself involved a changed interpretation, 467 U.S. at 862, yet the Court deferred to the EPA's interpretation. That is not to say we should ignore the VA's history of inconsistent interpretations. *See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) ("[T]he consistency of an agency's position is a factor in assessing the weight that position is due."). So long as the change is not "sudden and unexplained" and the agency "take[s] account of legitimate reliance on prior interpretation," the "change is not invalidating." *See Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996).

The administrative record shows the VA made a reasoned change that accounted for settled expectations. The VA explained how its prior definition, which coupled the definition of "serious injury" and "in need of personal care services," led to administration problems. Then, it set about resolving those problems by changing its definition of "serious injury." There was ample explanation for this changed position, and it was far from sudden. The change also accounted for settled expectations. As the VA noted, 98 percent of veterans who were eligible under the legacy program had a disability rating of 70 percent or higher. Thus, the VA's change of opinion is "not invalidating." *Smiley*, 517 U.S. at 742.

Nor is the VA's definition unreasonable because it requires veterans to apply for disability compensation. The statutory text requires the veteran's "serious injury" to have been "incurred or aggravated in the line of duty in the active military, naval, air, or space service." 38 U.S.C. § 1720G(a)(2)(B). And the definition of "service-connected" is almost identical:

The term "service-connected" means, with respect to disability or death, that such disability was

incurred or aggravated, or that the death resulted
from a disability incurred or aggravated, in line of
duty in the active military, naval, air, or space ser-
vice.

38 U.S.C. § 101(16).  It is, thus, not unreasonable to inter-
pret this language as requiring service connection.  Nor
was it unreasonable for the VA to require veterans to take
advantage of the already-existing system for evaluating
service connection.  And Petitioners have offered no reason
why a special processing system for family caregivers pro-
gram claims would not contribute to, rather than alleviate,
claim processing delays.

Finally, Petitioners claim the VA's definition of "seri-
ous injury" is inconsistent with other portions of the Final
Rule.  They point to statements that family caregiver ben-
efits are "not designed to supplement or replace the disa-
bility compensation received by the veteran."  *See Final
Rule*, 85 Fed. Reg. at 46,234.  So they claim family care-
giver benefits cannot be contingent on a disability rating.
But that conclusion does not follow.  Nothing about using
disability rating as one condition for awarding family care-
giver benefits makes those benefits a supplement to or a
replacement for disability compensation.  The programs
are distinct.

In sum, the VA's interpretation of "serious injury" in
the statute is reasonable.  The VA explained its decision to
redefine that term, and it made a reasonable policy deci-
sion in promulgating the new regulatory definition.  Ac-
cordingly, we are bound to accept the VA's definition of
"serious injury." Thus, we deny Petitioners' petition on this
ground.

## C. Inability to Perform

Petitioners' third challenge is aimed at a portion of the
statutory requirements for a veteran to qualify as an "eli-
gible veteran." A veteran must be "in need of personal care

VETERAN WARRIORS, INC. v.                                          29
SECRETARY OF VETERANS AFFAIRS

services," and there are four avenues through which a veteran may meet that requirement. 38 U.S.C. § 1720G(a)(2)(C)(i)–(iv). The first avenue is an "inability to perform one or more activities of daily living[.]" *Id.* § 1720G(a)(2)(C)(i).

From 2011 through 2020, the regulatory scheme defined "inability to perform an activity of daily living (ADL)" as any one of the following:

(1)  Inability to dress or undress oneself;

(2)  Inability to bathe;

(3)  Inability to groom oneself in order to keep oneself clean and presentable;

(4)  Frequent need of adjustment of any special prosthetic or orthopedic appliance that, by reason of the particular disability, cannot be done without assistance (this does not include the adjustment of appliances that nondisabled persons would be unable to adjust without aid, such as supports, belts, lacing at the back, etc.);

(5)  Inability to toilet or attend to toileting without assistance;

(6)  Inability to feed oneself due to loss of coordination of upper extremities, extreme weakness, inability to swallow, or the need for a non-oral means of nutrition; or

(7)  Difficulty with mobility (walking, going up stairs, transferring from bed to chair, etc.).

38 C.F.R. § 71.15 (2015). But nothing in that definition explained how frequent an "inability" was required for a veteran to qualify as eligible. In 2020, the VA amended its definition of "inability to perform an activity of daily living" to clarify that point:

> *Inability to perform an activity of daily living (ADL)* means a veteran or servicemember requires personal care services *each time* he or she completes one or more of the following:
>
> (1)  Dressing or undressing oneself;
>
> (2)  Bathing;
>
> (3)  Grooming oneself in order to keep oneself clean and presentable;
>
> (4)  Adjusting any special prosthetic or orthopedic appliance, that by reason of the particular disability, cannot be done without assistance (this does not include the adjustment of appliances that nondisabled persons would be unable to adjust without aid, such as supports, belts, lacing at the back, etc.);
>
> (5)  Toileting or attending to toileting;
>
> (6)  Feeding oneself due to loss of coordination of upper extremities, extreme weakness, inability to swallow, or the need for a non-oral means of nutrition; or
>
> (7)  Mobility (walking, going up stairs, transferring from bed to chair, etc.).

38 C.F.R. § 71.15 (second emphasis added).  That is, a veteran must be consistently unable to perform an activity of daily living to qualify as eligible.  An inability that is intermittent or occasional will not suffice.

Petitioners challenge the VA's interpretation of "inability to perform."  They argue the VA's requirement that the veteran have total inability for a single activity of daily living conflicts with the statutory language.  They also argue, in the alternative, that the VA's interpretation is an

unreasonable interpretation of the statutory scheme.  We do not agree.

### 1. Step One

Congress has not spoken to the interpretive question rasied in this challenge—the meaning of "inability to perform" in § 1720G(a)(2)(C).  The meaning of that phrase, to some extent, is clear.  But the statutory text and structure do not speak to how often a veteran must be unable to perform an activity of daily living.  There is a statutory gap, and we, therefore, must defer to the VA's regulations filling that gap.

To have an "inability to perform" an activity of daily living, a veteran must be wholly unable to complete that activity.  It cannot be that the veteran can complete the task, but only with great effort or time.  The ordinary meaning of "inability" prevents such an interpretation. *See Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) ("[O]ur job is to interpret the words consistent with their ordinary meaning at the time Congress enacted the statute.").

But the surrounding statutory language adds a dimension that Congress has not addressed.  The statute requires an "inability to perform one or more activities of *daily* living" for a veteran to qualify as eligible under this avenue. 38 U.S.C. § 1720G(a)(2)(C)(i) (emphasis added).  By using the word daily, Congress required the relevant activities to occur with some regularity. *See also* 38 C.F.R. § 71.15 (promulgating list of activities of daily living, each of which involves regular conduct—like eating or bathing).  While the word inability requires the veteran be wholly unable to complete the activity, it does not speak to *how often* that inability must present.  A veteran may be unable to bathe all of the time, most of the time, or only some of the time.  It is not clear under the statutory text what frequency is required.  Nothing in the text, structure, or purpose of the statute answers that question.

Petitioners suggest the statutory text forecloses the VA's interpretation, which requires inability each time the veteran attempts an activity, but their argument is not persuasive. Petitioners focus on a single phrase—"one or more"—for support. But the statute's use of that phrase in "inability to perform one or more activities of daily living" provides no insight into how pervasive an inability is required. It means only that, whatever inability is required, a veteran need only show an inability for one or more activities of daily living. This language does not undermine the VA's decision to focus on activities of daily living individually, rather than as a unit.

Nor does the VA's interpretation lead to an absurd result. *See Nat'l Ass'n of Mfrs. v. Dep't of Treasury*, 10 F.4th 1279, 1288 (Fed. Cir. 2021) (invalidating regulation at step one based on absurdity). To be sure, the VA's interpretation would prevent a veteran who required assistance 99 percent of the time for all activities of daily living from receiving benefits. But this single hypothetical, at the very extreme of possibility, does not render the VA's interpretation absurd. *Cf. U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) ("[T]he task of classifying persons for . . . benefits inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line[.]") (internal quotation marks omitted). And Petitioners have not meaningfully challenged the VA's finding that the impact of this hypothetical will be minor. *See Final Rule*, 85 Fed. Reg. at 46,234 ("We believe that if a veteran or servicemember needs assistance with multiple ADLs, it is likely that at least one of those ADLs requires assistance each time the ADL is completed.").

Petitioners also suggest the VA lacked authority to resolve the statutory silence or, at least, to resolve that question by requiring inability each time a veteran completes an activity of daily living. Pet'rs' Br. 27. But Congress delegated to the VA authority to administer the family

caregivers program.  38 U.S.C. § 1720G(a)(2)(A).  And that delegation comes with the ability to promulgate regulations to fill gaps in the statutory scheme.  *Morton v. Ruiz*, 415 U.S. 199, 231 (1974) ("The power of an administrative agency to administer a congressionally created and funded program necessarily requires . . . the making of rules to fill any gap left, implicitly or explicitly, by Congress.").

Ultimately, Congress left a gap in the statute.  It required an "inability to perform one or more activities of daily living," but it did not speak to how often an inability is required.  The VA promulgated a regulation answering that question, and we must defer to that interpretation.

## 2. Step Two

The VA's interpretation of "inability to perform"—requiring permanent inability—is a permissible construction of the statute.  It is a product of the VA's reasonable policy judgment, so we are bound to follow the VA's interpretation.  *See Brand X*, 545 U.S. at 986 (discussing step two).

The VA interpreted "inability to perform one or more activities of daily living" to clarify the eligibility requirements for the family caregivers program and to ease its administration of that program.  *See, e.g.*, *Proposed Rule*, 85 Fed. Reg. at 13,360–61.  The VA also noted how this definition supported its goal of focusing the family caregivers program on those veterans who have moderate to severe needs.  *See, e.g.*, *id.* at 13,360.  These are reasonable policy goals, *see supra* § II(A)(2), and Petitioners have offered no persuasive arguments for why the VA's interpretation is not a reasonable effort at accomplishing those goals.

Petitioners claim this rule should receive considerably less deference under *Watt*, 451 U.S. at 273.  Yet they fail to make the predicate showing necessary for *Watt* to apply: an inconsistency between the VA's current and former interpretations.  They claim the VA's definition of "inability to perform one or more activities of daily living" contradicts

the prior regulatory framework, which they read to use pervasiveness only in setting caregivers' stipend levels. But Petitioners misunderstand those regulations.

In 2015, the VA promulgated a rating scale for determining the stipend amount provided to primary caregivers. *See* 38 C.F.R. § 71.40(c)(4) (2015). For each activity of daily living, the VA assigned each veteran a score from zero to four:

| Score | Veteran's Ability |
|-------|-------------------|
| Zero | completes the task/activity without assistance |
| One | requires minimal assistance (can complete 75 percent or more of the task without supervision or assistance) |
| Two | requires moderate assistance (can complete 50 percent to 74 percent of the task without assistance) |
| Three | requires maximal assistance (can complete 25 percent to 49 percent of the task without assistance) |
| Four | requires total assistance (can complete less than 25 percent of the task or is unable to do the task without assistance) |

*See id.* § 71.40(c)(4)(iii) (2015) (reformatted). The VA then summed those scores and assigned primary family caregivers a stipend amount based on that sum. *Id.* § 71.40(c)(4)(iv)–(v) (2015). This framework does not, as Petitioners suggest, address *how often* a veteran requires assistance to complete an activity of daily living. It is focused on *how much* assistance—minimal, moderate, maximal, or total—is needed for each activity. Because the stipend schedule had nothing to say about how often a veteran needed assistance, it cannot conflict with the VA's "each time" requirement.

Petitioners also claim the rule is unreasonable because it excludes many veterans who deserve benefits and because the VA could have adopted a less draconian rule—like needing assistance 50 or 70 percent of the time—that is still clear and administrable. But this argument does not undermine the reasonableness of the VA's regulation. In effect, Petitioners believe the VA should have chosen a different rule. They would prefer the VA to have set its bright-line at a lower level. We cannot, however, set aside the VA's reasonable interpretation of the statute simply because we (or Petitioners) might prefer a different interpretation. *Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1295 (Fed. Cir. 2021) ("The agency's construction need not be the only reasonable interpretation or even the most reasonable interpretation."). Congress delegated to the VA the authority fill gaps in the statutory scheme. If the VA's interpretation is reasonable, it must be upheld.

To conclude, the VA's interpretation of "inability to perform one or more activities of daily living" is reasonable. In such circumstances, we are bound to adhere to the VA's interpretation. So we deny the Petitioners' petition on this ground.

D. Need for Supervision, Protection, or Instruction

Petitioners next challenge the VA's interpretation of two of the remaining avenues through which a veteran may qualify as "in need of personal care services." 38 U.S.C. § 1720G(a)(2)(C). Those avenues are available to veterans who need supervision, instruction, or protection:

For purposes of this subsection, an eligible veteran is any individual who—

(C) is in need of personal care services because of . . .

(ii) a need for supervision or protection based on symptoms or

> residuals of neurological or other impairment or injury; [or]
>
> (iii) a need for regular or extensive instruction or supervision without which the ability of the veteran to function in daily life would be seriously impaired[.]

*Id.* Congress added the latter avenue, subsection (iii), in the VA MISSION Act of 2018 in an effort to expand benefits. After that Act, the VA promulgated a regulatory definition aimed at implementing both subsections (ii) and (iii):

> Need for supervision, protection, or instruction means an individual has a functional impairment that directly impacts the individual's ability to maintain his or her personal safety on a daily basis.

38 C.F.R. § 71.15.

Petitioners claim the VA's regulation is inconsistent with the statutory text, which creates two distinct pathways that the VA has improperly combined into a single definition. They also claim the VA's interpretation is not reasonable. We agree the VA's rule fails at step one, and therefore, we need not reach step two.

By requiring "supervision . . . on a daily basis," the VA's interpretation conflicts with the statutory text. Subsections (ii) and (iii) both relate to a veteran's need for supervision, but Congress used different terms when describing that need. For subsection (ii), it required the veteran be in need of "supervision or protection." But for subsection (iii), Congress required that a veteran be in need of "*regular or extensive . . .* supervision." Presumably, this change in phrasing carries meaning. *E.g.*, *Sosa v. Alvarez–Machain,* 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings

were intended."). So the VA's decision to create a single frequency requirement for supervision is inconsistent with the statutory language.

The VA's interpretation further conflicts with the statutory language by requiring "a functional impairment that directly impacts the individual's ability to maintain his or her personal safety." *See* 38 C.F.R. § 71.15. To be sure, part of subsection (ii) relates to a veteran's need for "protection based on symptoms or residuals of neurological or other impairment or injury." And by using the word protection, Congress focused this portion of the statute on the personal safety of veterans. But subsection (ii) also covers a veteran's need for "*supervision . . .* based on symptoms or residuals" of an impairment or injury, and nothing in that portion of the statute implicates personal safety. Nor is subsection (iii) limited to personal safety concerns. It only requires that, without instruction or supervision, "the ability of the veteran to function in daily life would be seriously impaired." That phrase, while it may include personal safety concerns, is unambiguously broad enough to encompass impairments that do not implicate personal safety. Thus, some aspects of the statutory language provide benefits to veterans who need supervision or instruction but would not risk their personal safety in the absence of that care. Accordingly, the VA's personal safety requirement is inconsistent with the statutory text.

To be clear, we do not hold the VA cannot promulgate a regulation to account for both subsection (ii) and subsection (iii). We see nothing in the statutory text, structure, or purpose that forecloses such an interpretation. But if the VA chooses to promulgate a single regulatory definition, its definition must be consistent with the text of both statutory provisions. Because the current regulation does not meet that requirement, we must set it aside at step one. We, therefore, grant the petition on this ground.

#### E. Geographic Residence

Petitioners' fifth challenge goes to the VA's imposition of a geographic residence requirement. From 2011 until 2020, the VA had a practice of providing family caregiver benefits only to caregivers who reside in the United States. *See Proposed Rule*, 85 Fed. Reg. at 13,358. In overhauling the regulatory framework implementing the family caregivers program, the VA added regulatory language formalizing that practice:

> This part regulates the provision of benefits under the Program of Comprehensive Assistance for Family Caregivers and the Program of General Caregiver Support Services authorized by 38 U.S.C. 1720G. Persons eligible for such benefits may be eligible for other VA benefits based on other laws or other parts of this title. These benefits are provided only to those individuals residing in a State as that term is defined in 38 U.S.C. 101(20).

38 C.F.R. § 71.10(b).

Petitioners challenge this requirement at both steps of the *Chevron* framework. First, they claim the residency requirement is inconsistent with the statutory language, which does not impose such a requirement. Second, they argue that requirement is also an unreasonable interpretation of the statutory language. We do not agree.

#### 1. Step One

Congress has not spoken to the precise interpretive question at issue in this challenge—whether a caregiver must reside within the United States to be entitled to benefits. The statutory text is silent on that point, and the statutory structure provides no additional clarity. There is, in short, a statutory gap.

To begin, we look to the text of the statute. Nothing in § 1720G(a) compels or forecloses the VA from imposing a

geographic residency requirement. There is no provision directed to residency, nor is there a provision suggesting that the caregivers who reside abroad are entitled to benefits. That is, the statutory language is silent.

Petitioners claim the statutory guidelines for caregiver stipends foreclose the VA's interpretation, but we do not agree. As described above, *see supra* § II(A)(1), the statute provides guidelines for setting caregiver stipend amounts. One guideline relates to the stipend afforded primary family caregivers:

> The Secretary shall ensure, to the extent practicable, . . . that the amount of the monthly personal caregiver stipend . . . is not less than the monthly amount a commercial home health care entity would pay an individual *in the geographic area* of the eligible veteran to provide equivalent personal care services to the eligible veteran.

*Id.* § 1720G(a)(3)(C)(ii) (emphasis added). To be sure, the statute requires the VA to account for geographic location when setting compensation. But it does nothing to resolve the statutory silence here, which relates to the *eligibility for* benefits not the *amount of* benefits. Moreover, that Congress addressed geographic location in one provision (stipends) but chose to remain silent elsewhere (entitlement) does not prevent the VA from regulating to fill a statutory gap. *See Catawba Cnty.*, 571 F.3d at 36 ("[A] congressional mandate in one section and silence in another often suggests not a prohibition but simply a decision not to mandate any solution in the second context, i.e., to leave the question to agency discretion."). No part of the Caregiver Act suggests that silence was meant to limit the VA's authority—especially given Congress' express delegation of authority to the VA. *See* 38 U.S.C. § 1720G(a).

For similar reasons, Congress' creation of the foreign medical program does not undermine the VA's interpretation. That program affords the VA discretion to provide

certain medical benefits to veterans who live abroad.  *See id.* § 1724(b)–(c).  That is, Congress expressly addressed how veterans' residency affects their entitlement to certain medical benefits.  But the fact that Congress spoke in one place (the foreign medical program), while remaining silent in another (the family caregivers program), does not foreclose the VA's interpretation here.  There is no reason to believe that silence was a proscription given Congress' express delegation of authority to the VA.  *See Catawba Cnty.*, 571 F.3d at 36 (discussing impact of silence); *see also* 38 U.S.C. § 1720G(a) (delegating authority).

Nor could the family caregivers program be administered through the foreign medical program.  The foreign medical program allows the VA to provide "medical care," including "noninstitutional extended care services," to non-resident *veterans*.  38 U.S.C. § 1724; *see also* 38 U.S.C. § 1701(6)(E) (defining "medical care").  That does not mean, however, that a *caregiver* can receive family caregiver benefits through that program.  The programs are aimed at different populations and provide different benefits.

In sum, Congress has not spoken to whether a caregiver must reside within the United States to be entitled to benefits.  And it expressly delegated the VA authority to establish the family caregivers program.  In such circumstances, we must defer to the VA's reasonable gap-filling regulations.

### 2. Step Two

The VA's imposition of a geographic residency requirement is a permissible construction of the statute.  It is a product of the VA's reasonable policy judgment, and it is not entitled to less deference at step two.  Thus, we defer to the VA's interpretation.  *See Brand X*, 545 U.S. at 986 (discussing step two).

The VA promulgated the residency requirement to formalize its long-standing practice of limiting benefits to

U.S.-based caregivers. Since passage of the Caregivers Act, the VA limited its administration to the United States. It believed that "it [wa]s not currently feasible for [the] VA to provide benefits [under the Caregivers Act] outside of a State." *Proposed Rule*, 85 Fed. Reg. at 13,358; *accord Final Rule*, 85 Fed. Reg. at 46,227. That belief was supported by the nature of the benefits provided under the family caregivers program, like in-home visits and respite care. Those benefits would be difficult to provide outside the United States, and the VA concluded the high costs outweighed the benefits. *Id.*

We cannot say the VA made an unreasonable policy choice limiting the family caregivers program to those caregivers who reside in the United States. Much of the family caregivers program involves oversight and benefits that would be difficult to administer abroad. Home health visits and respite care, for example, would be difficult to administer in a foreign country. *See* 38 U.S.C. § 1720G(a)(9)(c) (providing VA authority to review directly the quality of personal care services provided to the eligible veteran in the veteran's home); *id.* § 1720(a)(3)(B) (describing respite care). And Petitioners have offered no persuasive arguments undermining the reasonableness of the VA's regulatory decision.

Petitioners claim this regulation is entitled to "less deference than usual" because it does not relate to the VA's substantive expertise. Pet'rs' Br. 51 (citing *Gonzales v. Oregon*, 546 U.S. 243, 269 (2006); *Kisor*, 139 S. Ct. at 2419). They focus on how this is a geographic requirement, and how the VA lacks expertise in matters of geography. While the VA may lack experience in matters of geography, Petitioners ignore the underlying policies motivating the VA's interpretation. The VA promulgated its residency requirement because of difficulties administering the Caregivers Program abroad. Those difficulties, which relate to how veterans' benefits should be administered, fit squarely within the VA's expertise. So the geographic nature of this

rule does not undermine our obligation to defer to the VA's reasonable interpretations.[9]

Petitioners also argue the VA's interpretation is entitled to less deference under *Watt*, 451 U.S. at 273, but they have failed to show the requisite inconsistency. They claim the residency requirement is inconsistent with the VA's *current* definition of serious injury. But that is not the concern *Watt* is aimed at addressing. *Watt* is directed to agencies' changed interpretations, i.e., when an agency's "current interpretation [is] in conflict with its initial position." 451 U.S. at 273. Petitioners identify no change in the VA's position, which has been consistent throughout its administration of the Caregivers program. Veterans outside the United States have never received benefits.

Petitioners only posit an internal inconsistency in the VA's current regulations. Internal inconsistency can render an interpretation unreasonable, arbitrary, or capricious. *See, e.g.*, *Air Line Pilots Ass'n v. F.A.A.*, 3 F.3d 449, 453 (D.C. Cir. 1993). But Petitioners have failed to identify any internal inconsistency. Their argument depends on the family caregivers program being administered through the foreign medical program—an argument we have already rejected.

Finally, Petitioners claim the VA's definition is unreasonable because the VA provides other programs outside

---

9    It is also not clear that a lack of substantive expertise prevents *Chevron* deference, rather than *Auer* or *Skidmore* deference. *See Gonzales*, 546 U.S. 243, 269 (2006) (discussing deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)); *Kisor*, 139 S. Ct. at 2419 (discussing deference under *Auer v. Robbins*, 519 U.S. 452 (1997)). As Justice Roberts' concurrence in *Kisor* notes, these doctrines have different concerns. *Kisor*, 139 S. Ct. at 2424–25. We need not address that question here.

the United States. It is not, however, unreasonable for the VA to provide some programs abroad while limiting the family and general caregivers program to U.S.-based veterans. The VA found that it was "not feasible for [it] to provide [those programs] outside of [the United States]." *See Final Rule*, 85 Fed. Reg. at 46,227. And Petitioners have failed to show that conclusion is unreasonable. Indeed, each of the programs Petitioners cite recognize the VA's discretion to assess feasibility of administration abroad. *See* 38 C.F.R. §§ 17.35 (providing the VA *discretion* to provide hospital services abroad), 21.130 (affording the VA *discretion* to provide educational courses abroad when the VA determines it is "in the best interest of the veteran and the Federal Government"), 36.4405(b)(5) (allowing VA to provide specially adapted housing grants to be applied to houses outside the United States if the VA "has determined that is reasonably practicable"). So these provisions support the VA's ability to assess the feasibility of administering benefits outside the United States.

In conclusion, the VA's interpretation is reasonable. It is the product of a reasonable policy choice, weighing the costs and benefits of administration outside the United States. And Petitioners have failed to identify any inconsistency within the current regulatory framework or between the current framework and the VA's past interpretation. In such circumstances, we must defer to the VA's interpretation. Accordingly, we deny the petition on this ground.

## F. Monthly Stipend Rate

Petitioners' sixth challenge focuses on the VA's schedule for stipend payments. Congress delegated authority to set the level of stipend payments afforded primary family caregivers:

> The amount of the monthly personal caregiver stipend provided under subparagraph (A)(ii)(V) shall be determined in accordance with a schedule

> established by the [VA] that specifies stipends
> based upon the amount and degree of personal care
> services provided.

38 U.S.C. § 1720G(a)(3)(C)(i). But it restricted the scope of
the VA's authority by setting a minimum compensation
level, *id.* § 1720G(a)(3)(C)(ii), and by requiring the schedule account for certain factors, *id.* § 1720G(a)(3)(C)(i), (iii).

In 2015, the VA exercised its delegated authority by
promulgating a schedule for stipend amounts. 38 C.F.R.
§ 71.40 (2015). That schedule, described in § II(D)(2), assigned caregivers a stipend amount based on how much
care a veteran needed to complete his activities of daily living. *Id.* For example, if the sum of a veteran's clinical rating scores was 21 or greater, his caregiver was entitled to
a stipend that approximated 40 hours of caregiver assistance. Thus, the VA would multiply 40 hours by the caregiver's "combined rate" to arrive at the stipend amount.
And it defined "combined rate" as:

> [T]he Bureau of Labor Statistics (BLS) hourly
> wage rate for home health aides at the 75th percentile in the eligible veteran's geographic area of
> residence, multiplied by the Consumer Price Index
> for All Urban Consumers (CPI–U). The combined
> rate will be determined for each geographic area on
> an annual basis. For each geographic area, the
> combined rate will be the higher of:
>
>> (1) The most recent BLS hourly wage rate
>> for home health aides at the 75th percentile
>> in the geographic area multiplied by the
>> most recent CPI–U; or
>>
>> (2) The combined rate applied for the geographic area in the previous year.

38 C.F.R. § 71.15 (2015).

In 2020, the VA amended its schedule for stipend amounts. It removed reliance on the clinical rating scores and, instead, set stipend amounts based on whether the veteran is "unable to self-sustain in the community." If so, the veteran's caregiver is entitled to a full stipend amount; and if not, the veteran's caregiver is only entitled to 62.5 percent of the full stipend amount. 38 C.F.R. 71.40(c)(4)(i). Rather than calculating the full stipend amount based on a "combined rate," the VA pivoted to using a "monthly stipend rate." And it defined that term:

> [T]he Office of Personnel Management (OPM) General Schedule (GS) Annual Rate for grade 4, step 1, based on the locality pay area in which the eligible veteran resides, divided by 12.

38 C.F.R. § 71.15.

Petitioners challenge the VA's definition of "monthly stipend rate." They claim that definition, by incorporating the GS scale, is inconsistent with the statutory framework. They also argue it is an unreasonable interpretation of the statute. We do not agree.

### 1. Step One

Congress expressly left a statutory gap for the VA to fill, the schedule for stipend payments under the family caregivers program. And Petitioners have failed to show the VA's decision to rely on the GS scale when filling that gap is inconsistent with the statutory text, structure, or purpose.

Petitioners claim the VA's reliance on the GS scale is inconsistent with 38 U.S.C. § 1720G(a)(3)(C)(ii), but we do not agree. That statutory section requires the VA ensure, "to the extent practicable," stipend amounts are "not less than the monthly amount a commercial home health care entity would pay an individual in the geographic area of the eligible veteran to provide equivalent personal care services to the eligible veteran." *Id.* Contrary to Petitioners'

view, nothing about this statute requires the VA to use a commercial rate. It just sets a minimum stipend amount the VA must strive to achieve. Congress left it to the VA to determine how to accomplish that directive, whether by adopting a commercial rate or adopting some other rate that is at least as great as the commercial rate. The statute is, in other words, silent.

Petitioners also claim Congress' choice to use the GS scale in other circumstances, but not for the family caregivers program, forecloses the VA's interpretation. But Congress' mandate in one section and silence in the family caregivers program does not indicate a proscription. *See Catawba Cnty.*, 571 F.3d at 36. That is especially true when, as here, Congress expressly provided the VA authority to fill this statutory gap. The statutory silence is best interpreted as a delegation to the VA.

Finally, nothing about the history or purpose of the Caregiver Act precludes the VA's interpretation. Petitioners point to how the statutory text has not changed in 10 years, but that just shows that Congress has left a statutory gap for 10 years. It is not evidence of Congress' unambiguous intent.

In sum, Congress left a statutory gap. It delegated to the VA authority to promulgate a schedule for stipend amounts, provided the VA's schedule met certain statutory requirements. And the VA promulgated a schedule consistent with those requirements, using the GS scale to set stipend amounts. Thus, we must defer to that regulation at step two.

### 2. Step Two

The VA's use of the GS scale is a permissible construction of the statute. It is a product of the VA's reasonable policy judgment, which we are bound to follow. *See Brand X*, 545 U.S. at 986 (discussing step two).

The VA relied on the GS scale in setting stipend amounts because it was "an appropriate reference point." *Proposed Rule*, 85 Fed. Reg. at 13,382. The GS scale "historically tracked closely with median wage growth for home health aides" and "accounts for variations in cost-of-living across the [United States.]" *Id.* Also, by relying on a single grade and step, the VA "ensure[d] more consistent, transparent, and predictable stipend payments" for primary family caregivers. *Id.* To ensure the GS wage rate tracks private sector wages for home health aides, the VA went through an extensive analysis. *Id.* at 13,382–83. And it artificially inflated the selected GS grade and step to ensure family caregivers receive a large enough stipend. *Id.* at 13,383.

Also, the VA viewed its new definition as remedying many of the problems associated with reliance on the BLS hourly wage rate. *Id.* at 13,382. The BLS rate required manual calculations, while the GS scale allowed automation. The VA noted how using the GS scale would also cause less fluctuation in stipend amounts and would ensure greater transparency than reliance on the BLS hourly wage rate. *Id.*

We cannot say this was an unreasonable policy decision. It is reasonable for the VA to prefer a clear, more easily administrable metric for primary family caregiver stipends. And the VA went to great lengths to ensure that this stipend amount was at least equivalent to, if not greater than, the annual salary paid to a home health aide in the commercial sector. And Petitioners have offered no persuasive arguments undermining the VA's policy decision.

Like for their other challenges, Petitioners argue the regulation is wholly unpersuasive and entitled to less deference under *Watt*, 451 U.S. at 273. Here, Petitioners have made the predicate showing necessary for *Watt* to apply: a conflict between the VA's current position and its initial

position. *See id.* Before, the VA relied on the BLS hourly wage rage, and now, it relies on the GS scale. But the VA provided a reasoned, reasonable explanation for why it adopted that change. *See supra* § II(B)(2) (discussing how *Watt* and subsequent Supreme Court cases allow the VA to change its policy decisions). And it accounted for settled expectations, providing an adjustment period. *See* 38 C.F.R. § 71.40(c)(4). In such circumstances, the VA's decision to change its stipend calculation formula does not invalidate the VA's exercise of its regulatory authority.

Ultimately, the VA's interpretation is a permissible construction of the statute. Congress left a gap, and the VA reasonably filled that gap by promulgating a schedule for stipends. In such circumstances, we are bound to accept the VA's statutory interpretation. Accordingly, we deny the petition on this ground.

### G. Unable to Self-Sustain

Petitioners' final challenge is to the VA's standard for providing a primary family caregiver full stipend benefits: that the veteran is "unable to self-sustain in the community." If the veteran is unable to self-sustain, his primary family caregiver is entitled to the maximum stipend amount. If not, the veteran's primary family caregiver is entitled to only 62.5 percent of the maximum stipend amount. The VA's definition of that phrase turns on a veteran's need for personal care services:

Unable to self-sustain in the community means that an eligible veteran:

(1) Requires personal care services each time he or she completes three or more of the seven activities of daily living (ADL) listed in the definition of an inability to perform an activity of daily living in this section, and is fully dependent on a caregiver to complete such ADLs; or

> (2) Has a need for supervision, protection, or instruction on a continuous basis.

38 C.F.R. § 71.15.

Petitioners challenge this definition as violating both steps of the *Chevron* inquiry. First, they claim this definition conflicts with various parts of the statute. Second, they claim the VA's interpretation is entitled to less deference and is an unreasonable interpretation of the statute. We do not agree.[10]

### 1. Step One

Congress expressly left a statutory gap for the VA to fill: the schedule for stipend payments under the family caregivers program. *See* 38 U.S.C. § 1720G(a)(3). And Petitioners have failed to show the VA's decision to establish a two-tiered framework for benefits based on its definition of "unable to self-sustain in the community" conflicts with the statute. Accordingly, we cannot resolve this question at step one.

The VA's stipend schedule takes into account the required statutory factors. Congress imposed certain limits on the VA's discretion to set the primary family caregivers' stipend amounts:

> (i) The amount of the monthly personal caregiver stipend provided . . . shall be determined in accordance with a schedule established by the Secretary that specifies stipends based upon the amount and degree of personal care services provided. . . .
>
> (iii) In determining the amount and degree of personal care services . . . with respect to an eligible

---

[10]  Because Petitioners lack standing to challenge the three-or-more requirement, *see supra* § I, we do not address their arguments on that front.

veteran whose need for personal care services is based in whole or in part on a need for supervision or protection . . . or regular instruction or supervision . . . , the Secretary shall take into account the following:

> (I) The assessment by the family caregiver of the needs and limitations of the veteran[;]
>
> (II) The extent to which the veteran can function safely and independently in the absence of such supervision, protection, or instruction[; and[11]]
>
> (III) The amount of time required for the family caregiver to provide such supervision, protection, or instruction to the veteran.

38 U.S.C. § 1720G(a)(3)(C). And the definition of "unable to self-sustain" accounts for these factors. It looks to whether a veteran needs assistance "on a continuous basis," which accounts for the extent of assistance required, *see id.* § 1720G(a)(3)(C)(ii), and the time required to provide assistance, *see id.* § 1720G(a)(3)(C)(iii). The VA has, moreover, indicated that its determination of continuous need will account for the family caregiver's assessment.

---

[11]   This provision does not use conjunctive ("and") or disjunctive ("or") language, but context makes clear the conjunctive applies. These categories are not different avenues for reaching the same outcome, like the paths for a veteran to be eligible. *See supra* at note 6 (discussing § 1720G(d)(4)). They are separate considerations that supplement one another. And there is no other provision using the disjunctive or conjunctive to describe these considerations. *Contra id.*

*Final Rule*, 85 Fed. Reg. at 46,264; *Proposed Rule*, 85 Fed. Reg. at 13,379.

The VA's standard for "on a continuous basis" is also consistent with the statutory text. The VA described that phrase as meaning "a regular, consistent, and prevalent need." *See Final Rule*, 85 Fed. Reg. at 46,273. And it indicated that "a continuous basis" is greater than a daily need. *Proposed Rule*, 85 Fed. Reg. at 13,384. Petitioners have failed to identify any text that conflicts with this requirement, instead arguing nothing in the text supports the continuous basis language. But that argument just identifies silence in the statutory scheme, and the VA has authority to fill the statutory silence with a reasonable regulation.

Petitioners also suggest that flaws in the VA's definition of "need for supervision, protection, or instruction" undermine the VA's stipend schedule. But nothing in that schedule relies on the impermissible portions of the VA's "need for supervision, protection, or instruction" definition. We set aside that definition because its "personal safety" and "daily basis" requirements conflict with the statutory text. And neither of those requirements is incorporated in the VA's definition of "unable to self-sustain in the community." To be sure, like the VA's definition of "need for supervision, protection, or instruction," its definition of "unable to self-sustain in the community" combines two statutory subsections into a single regulatory definition. But we see no problem with that under the statutory text.

Ultimately, Congress expressly left a statutory gap. It delegated the VA authority to promulgate a schedule for stipend amounts, provided the VA's schedule met certain statutory requirements. And the VA promulgated a schedule that is consistent with those requirements. Thus, we must defer to that regulation at step two.

### 2. Step Two

The VA's reliance on, and definition of, a veteran being "unable to self-sustain in the community" is a permissible construction of the statute. It is a product of the VA's reasonable policy judgment and is entitled to deference at step two. Thus, we are bound to follow the VA's interpretation. *See Brand X*, 545 U.S. at 986 (discussing step two).

The VA altered its stipend schedule because it found "that utilization of the three tiers set forth in the [prior] regulations ha[d] resulted in inconsistent assignment of [the] 'amount and degree of personal care services provided.'" *Proposed Rule*, 85 Fed. Reg. at 13,383. The prior regulatory framework lacked "clear thresholds that" could be "easily understood and consistently applied," which "contributed to an emphasis on reassessment to ensure appropriate stipend tier assignment." *Id.* So the VA chose to employ a two-tiered framework with a clear delineation between the high and low tiers. *Id.*; *see also Final Rule*, 85 Fed. Reg. at 46,271. And it delineated between those tiers using its definition of "unable to self-sustain in the community," which accounts for the statutory requirements. *Proposed Rule*, 85 Fed. Reg. at 13,383–84. It believed that definition would provide a clear distinction between those veterans with moderate needs and those veterans with severe needs. *Id.*

We cannot say this was an unreasonable policy choice. The VA experienced difficulty in administering the family caregivers program, so it altered its regulations to ease those difficulties. Providing clear administrable rules is a reasonable policy goal. And Petitioners have not persuasively argued the VA's regulation is an unreasonable effort at achieving that goal.

They claim the VA's definition of "unable to self-sustain in the community" is unreasonably high. That is, the VA should not have required a continuous need for a veteran's caregiver to be entitled to the full stipend amount. But

Petitioners offer no reason why this regulation is unreasonable, and we cannot set aside a regulation simply because Petitioner would have preferred a lower bar. *See Deacero*, 996 F.3d at 1295.

Petitioners also argue the VA's focus on moderately to severely injured veterans does not comport with the statutory framework. But it was reasonable for the VA to consider focusing the family caregivers program on moderately to severely injured veterans, as such a focus finds support in the statute. *See* 38 U.S.C. § 1720G(a)(2) (requiring serious injury). It was also reasonable, given the VA's focus on those veterans, for the VA to establish a two-tiered framework aimed at distinguishing moderately injured veterans from severely injured veterans. Petitioners have not provided any persuasive arguments undermining this policy decision.

Petitioners finally argue the VA's stipend schedule is wholly unpersuasive and entitled to less deference under *Watt*, 451 U.S. at 273. Like with their other challenge to the stipend amounts, Petitioners have made the predicate showing necessary for *Watt* to apply. The VA's current stipend calculation system is different from its former system. But the VA provided a reasoned, reasonable explanation for why it adopted that change. *See supra* § II(B)(2) (discussing how *Watt* and subsequent Supreme Court cases allow the VA to change its policy decisions). And it accounted for settled expectations, providing an adjustment period. *See* 38 C.F.R. § 71.40(c)(4). In such circumstances, the VA's decision to change its stipend calculation formula does not render the VA's exercise of its regulatory authority unreasonable.

All told, the VA made a reasonable policy choice. It promulgated the two-tiered stipend framework in an effort to ease administration of benefits. And though that framework conflicts with the VA's prior framework, it is still entitled to *Chevron* deference. Applying that deference, we

conclude the VA reasonably filled a statutory gap. Accordingly, we are obligated to adopt the VA's interpretation. We therefore deny the petition as to this ground.

## CONCLUSION

For all the foregoing reasons, Petitioners' petition for review of the Final Rule is

## DISMISSED IN PART, GRANTED IN PART, AND DENIED IN PART

### COSTS

No costs.